notice, and I am of opinion that the consent of the commissioners to maintain the dam was without authority. Furthermore, the said consent contained the following clause: "Provided, furthermore, that private rights and rights of property of individuals, if any, of every nature and description, shall not be taken away, impaired, or impeded." I think that this proviso constituted a condition of the consent; and, as this condition has been violated, as found by the jury, which finding I adopt, the consent, if it ever had any validity, is not a defense.

Having arrived at the conclusion that the title to the bed of the river, on which the defendant's dam is erected, is in the people of the state, and that such dam was erected without authority, it follows that the erection and maintenance of the same is a purpresture, and per se a public nuisance, and should be abated. People v. Vanderbilt, 26 N. Y. 287.

---

(40 App. Div. 465.)

AMES v. MANHATTAN LIFE INS. CO. OF NEW YORK.

(Supreme Court, Appellate Division, First Department. May 19, 1899.)

1. LIFE INSURANCE—WAIVER OF CONDITIONS.
    A stipulation in the application that a policy shall not go into effect unless the insured is in good health when delivered and the first premium paid is waived by a general agent's acceptance of the premium and delivery of the policy after being informed of the illness of the insured.

2. SAME—APPLICATION—QUESTION FOR JURY.
    An application for an ordinary life policy was declined, without a further physical examination, to which the applicant refused to submit. A witness testified that on further negotiation the company's agent offered the insured an incontestible 20-year life policy, free from all conditions except the payment of larger premiums, but the agent denied that he offered it in that form. The 20-year life policy which was issued to and accepted by insured, distinctly referred to an application and the statements and covenants it contained; and the conditions indorsed on the policy explicitly referred to such statements, though these references were in the usual printed formula. *Held*, that whether the subsequent negotiation resulting in the issuance and acceptance of this policy was understood to be based on the original application was for the jury.

3. SAME—PLEADING—BREACH OF WARRANTY AND FRAUD.
    In an action on a policy, an answer averring that statements in the application were false and fraudulent is sufficient to raise both the questions of a breach of warranty and fraud.

4. SAME—APPLICATION—WARRANTY—CONSTRUCTION.
    Where an applicant warranted that the statements and answers made in his application were "full, complete, and true in every particular," he only warranted those answers which reasonably bear the construction of strict warranties, and not those which on their face merely import honest representations, made truthfully to the best of his knowledge, information, and belief.

5. SAME—TRUTHFUL ANSWER—CHANGE BY MEDICAL EXAMINER.
    Where insured gave a truthful answer to a question put by the insurer's medical examiner, and the latter wrote an untruthful answer, which the insured did not see, the insurer, and not the insured, is responsible for the falsehood.

6. SAME—ANSWER TO GENERAL QUESTION.
    Where an applicant is asked generally as to diseases of the genital or urinary organs, other than several which were specially inquired about,

it contemplates only a fair and honest answer from what he knows or has reason to believe.

7. SAME—ACTION ON POLICY—DISMISSAL AND DIRECTION OF VERDICT.
    Where defendant's motion to dismiss and for the direction of a verdict in an action on a policy were general, and did not specify as a ground a particular breach of warranty as proved by the evidence, there was no error in submitting the case to the jury, though the facts proved were sufficient to show the breach.

8. SAME—INSTRUCTIONS.
    An instruction in an action on a policy telling the jury that the insured warranted the answers in his application to be full, complete, and true, but not informing them what would amount to a breach, or what the legal consequences of a breach would be, is properly refused.

9. SAME.
    An instruction that if any of the answers made by insured, and which were warranted by him to be true, were not true, their verdict should be for defendant, is properly refused, where it is a question of fact whether or not the answers referred to relate to the policy sued on.

10. SAME—APPLICATION—MISTAKEN ANSWER—EFFECT.
    Where insured was suffering from a certain disease, and was not aware of it, his answer in his application that he was not suffering therefrom would not nullify the policy.

11. SAME—ACTION ON POLICY—EVIDENCE.
    Where insured made application for an ordinary life policy, and a 20-payment life was issued to him after the first-named policy was refused, evidence, in an action on the policy issued, as to an agreement by the company's agent after the first application was refused, and before the policy sued on was issued, to give the insured an incontestible policy, free from conditions, was admissible to show that the original application had been eliminated from the negotiation, and that defendant was willing to give the policy sued on without an application.

Appeal from trial term, New York county.

Action by Edwin A. Ames against the Manhattan Life Insurance Company of New York on a life insurance policy. From an order setting aside a verdict and judgment in favor of plaintiff, and granting a new trial, plaintiff appeals. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, McLAUGHLIN, and O'BRIEN, JJ.

George W. Miller, for appellant.

Edward S. Rapallo, for respondent.

BARRETT, J.    Upon the rendition of the verdict, the defendant's counsel moved for a new trial upon the minutes, "because," to quote from the record, "the verdict is contrary to the evidence, and upon the exceptions, and upon all the grounds stated in section 999 of the Code." The motion was originally denied, but upon further consideration the learned trial judge decided to grant it; and thereupon an order was made "setting aside the verdict and judgment, and granting a new trial." We are therefore called upon to examine the record, and determine whether there was sufficient ground for this action of the learned trial judge. In his opinion, he assigned as the ground of the decision his refusal to charge two propositions which were submitted by the defendant's counsel. We think, however, that he was quite justified in refusing to charge these two propositions, as we presently hope to show, and that their rejection did not authorize the granting of a new trial. This order, however, was not limited

to the rulings upon these two propositions, but covered all the exceptions taken upon the trial. It also embraced the contention that the verdict was contrary to the evidence. The present appeal must therefore be considered and decided quite as though the motion for a new trial had been denied, and the defendant were now appealing from such denial. The order, as we have seen, granted the new trial upon all the exceptions taken by the defendant. If, then, any one of these exceptions was well taken, and the ruling to which it related was prejudicial to the defendant, the order, without regard to the reasons assigned, was right, and should be affirmed. If, however, all the rulings were correct, and the verdict was not against the weight of evidence, the order should be reversed and the verdict sustained. This brings us to the examination of the entire record.

The action is upon a policy of life insurance which was issued by the defendant to Henry A. Ostermoor, of Netherwood, in the state of New Jersey, upon the 4th day of December, 1895. Upon the latter date Ostermoor assigned the policy to the plaintiff. He was at the time of the delivery of the policy sick in bed. Five days later he died. The defenses are: First, that the policy had no legal inception; and, second, that, if it had, it is void, because of the breach of certain alleged warranties contained in the application for insurance, and made a part of the policy.

This first defense is based upon a stipulation contained in the application to the effect that there shall be no contract of insurance until a policy shall be issued by the company and accepted, subject to the conditions therein contained, "during the good health of the person to be insured, and the first premium paid thereon." The contention is that, as Ostermoor was ill at the time when the policy was actually delivered, it was not issued and accepted during his good health, and consequently the contract had no legal inception. There was evidence, however, that Zimmerman, the company's agent in the transaction, was informed of Ostermoor's illness, and yet delivered the policy and accepted the first premium. This was denied by Zimmerman, but the evidence pro and con was fairly submitted to the jury, and the question of waiver decided against the defendant. The case, on this head, is thus brought within the principle stated in Wood v. Insurance Co., 149 N. Y. 385, 44 N. E. 81, namely, "that general agents of an insurance company may waive stipulations and provisions contained in the policy with respect to the conditions upon which it shall have inception and go into operation as a contract between the parties, by delivering it, with knowledge of all the facts, and receiving the premium." To the same effect are Walsh v. Insurance Co., 73 N. Y. 11, Forward v. Insurance Co., 142 N. Y. 382, 37 N. E. 615, and Gray v. Insurance Co., 155 N. Y. 180, 49 N. E. 675. As was said by Justice Rumsey upon the previous appeal in this case:

"It is fairly to be inferred from all the testimony that Zimmerman was the general agent of the company to take applications and deliver the policy; and, if he was such agent, his act in waiving a condition was undoubtedly within his power." 52 N. Y. Supp. 759.

The condition thus referred to was, of course, the one upon which the inception of the contract depended. We think, therefore, that

the verdict here establishes a waiver of the condition that there should be no contract until a policy was delivered and accepted during the good health of Ostermoor.

As to the second defense, there is a preliminary question with regard to the application itself. The plaintiff contends that the policy in suit was, notwithstanding the recital therein, issued without any preliminary application. It appears that there was an earlier negotiation for an ordinary life policy. The plaintiff and Ostermoor were approached on the subject by Zimmerman, and they agreed to take two ordinary life policies,—one for each. This was upon the 15th day of November, 1895, when the application was signed, and the physical examination by the company's doctor had. The company accepted Ames' application, but declined Ostermoor's, without a further physical examination by its medical board. Zimmerman thereupon offered to deliver Ames' policy, and suggested that Ostermoor go down to the company's office, and there submit to the further examination required. Ostermoor refused to do so, and told the agent that he and Ames did not want one policy without the other. Thereupon Zimmerman took Ames' policy away, but subsequently returned and renewed the negotiation. At this point there is a conflict of testimony; Ames stating that Zimmerman then offered an incontestible policy, free from all conditions except the payment of premiums, which were to be larger than those called for by the ordinary life policy, and were to run for but 20 years. Zimmerman denies telling Ostermoor or Ames that the new policy which he offered was to be incontestible and free from all conditions save the payment of premiums. The plaintiff claims that upon the rejection of the original application, and the refusal to issue the policy therein asked for, that application ceased to be a factor in the transaction, and that the subsequent negotiation for a different kind of policy contemplated the complete obliteration of all that had preceded, upon the subject of an application. He insists that there is not a particle of evidence in conflict with this view, and that the trial court should have so held, and directed a verdict accordingly. We are unable to concur in this view. It was, we think, a question fairly for the jury whether the subsequent negotiation, which resulted in the delivery and acceptance of the policy in suit, was not understood by the parties to be based upon the original application. The policy in suit distinctly refers to an application, and to the statements and covenants therein contained, and the conditions indorsed upon the policy also explicitly refer to such statements. The policy was accepted with these words distinctly appearing upon its face. It is true that the jury might have found, upon all the testimony, that the phrases in the policy which refer to the application were simply the usual printed formula left there solely from the force of habit, and that in fact the recited application was nonexistent, or they might have found that they related to the original application, and that the parties understood that that application was still the underlying basis of the new contract. They might, indeed, have concluded that what the company was willing to forego was merely the additional examination by its medical board, and that Ostermoor understood this; in other words, that

for an increased rate of premium the company would accept the risk upon the application already made, without such further examination. Of course, if the jury believed that the new 20-year policy was to be incontestible and entirely free from conditions, that necessarily eliminated the original application for the ordinary life policy. But, as we have seen, the fact claimed on that head was contested. If, then, the new policy was accepted as it read, without any talk importing the elimination of the original application, it was for the jury to draw one of two deducible inferences, namely, either that the application was understood by both parties to stand, or that it was entirely obliterated. As there was a general verdict, with no special finding, we cannot say how the jury found upon the point, and consequently we must review the exceptions as though the jury had found that the policy in suit was based upon the application.

Assuming, then, as we must for the purposes of this appeal, that the original application was a part of the policy in suit, the question remains as to the alleged breach of the warranties which it contained, and as to the correctness of the learned trial judge's rulings on that head. Objection is made by the plaintiff to the consideration of these questions upon the ground that a breach of warranty is not alleged in the answer. The answer does allege that the statements complained of were false and fraudulent. That allegation, we think, sufficed to raise both questions,—the breach of warranty and fraud. The allegation is, in substance, that the answers were both false; that is, untrue and fraudulent. We come then to the consideration of the defendant's assignments of error.

It is necessary to a proper understanding of the precise point presented by the defendant's requests that we should analyze the application, and ascertain just what Ostermoor warranted, and what he did not warrant. Eighty-nine questions were there put to him. Some of these were plainly mere representations; others, simple statements of his belief. He certainly did not warrant the literal accuracy of every answer given to every question. It was held in Fitch v. Insurance Co., 59 N. Y. 557, that although, where a warranty is understandingly and clearly given by the insured, he will be held strictly to his contract, yet the use of the term "warranty" is not always conclusive, and where it appears that, notwithstanding the use of that term, a warranty, in the strict legal sense of the word, was not intended, the answer will be treated simply as a statement, the honesty and good faith of which alone the applicant guaranties. This case was cited with approval in Dilleber v. Insurance Co., 69 N. Y. 256, where Judge Earl used this language:

"Warranties in policies of insurance are strictly construed. They will not be extended to include anything not necessarily implied in their terms. * * * When the language used in a policy may be understood in more senses than one, it is to be understood in the sense in which the insurer had reason to suppose it was understood by the insured."

The case of Moulor v. Insurance Co., 111 U. S. 335, 4 Sup. Ct. 466, is still more directly in point. There an applicant for life insurance was required to state categorically whether he had ever been affected with certain specified diseases. He answered that he had not. It

was held that, in the "absence of explicit stipulations requiring such an interpretation, it should not be inferred that the insured took a life policy with the understanding that it should be void if at any time in the past he was, whether conscious of the fact or not, afflicted with the diseases, or any of them, specified in the questions propounded by the company." "The entire argument in behalf of the company," said Harlan, J., "proceeds upon a too literal interpretation of those clauses in the policy and application which declare the contract null and void if the answers of the insured to the questions propounded to him were, in any respect, untrue. What was meant by 'true' and 'untrue' answers? In one sense, that only is true which is conformable to the actual state of things. In that sense, a statement is untrue which does not express things exactly as they are. But in another and broader sense the word 'true' is often used as a synonym of 'honest,' 'sincere,' 'not fraudulent.' Looking at all the clauses of the application, in connection with the policy, it is reasonably clear—certainly the contrary cannot be confidently asserted—that what the company required of the applicant, as a condition precedent to any binding contract, was that he would observe the utmost good faith towards it, and make full, direct, and honest answers to all questions, without evasion or fraud, and without suppression, misrepresentation, or concealment of facts with which the company ought to be made acquainted, and that by so doing, and only by so doing, should he be deemed to have made 'fair and true answers.' "

In the application under consideration we find many answers which could not have been deemed strict warranties. Question 25a was an inquiry as to whether the applicant had ever had la grippe? If so, what were its complications and results? Question 36 asked whether he had had colic, and whether it was renal or hepatic. Question 46 called for the cause of headaches. Question 64 was an inquiry as to predisposition, either hereditary or acquired, to (a) consumption, (b) scrofula, (c) cancer, (d) insanity, (e) syphilis, (f) gout, (g) rheumatism. Question 85 reads as follows: "Are you in perfect health, so far as you know and believe?" Question 88 reads: "Which parent do you physically resemble?" Many other illustrations might be added, of questions relating to latent diseases, and especially to matters which, in their inherent nature, contemplated naught save statements made to the best of the applicant's knowledge, information, and belief. But we have quoted enough to indicate the general character of the information required. Some of the questions undoubtedly called for strict warranties,—such, for instance, as questions 81, 82, and 83, inquiring when last the applicant consulted a physician, and for what reason, and what was the physician's name and address, and so on. But clearly they did not all call for strict warranties. When, therefore, in section 90, the applicant "warranted that the foregoing statements and answers are full, complete, and true in every particular," he only warranted those answers which reasonably bear the construction of strict warranties, and not those which on their face merely import honest representations, made truthfully to the best of the applicant's knowledge, information, and belief. This is emphasized by the use of the word "misstatement" in the same connection both in the.

policy and the application. The defendant limited its charges of breach of these alleged warranties to two specifications: First, that Ostermoor, when he signed the application, was suffering from cardiac insufficiency with chronic nephritis; and, second, that he was at the same time, and had been for several days before then, in the hands of a physician, whose name he failed to disclose. As to the latter specification, the plaintiff testified that in answer to questions 81, 82, and 83, put by the defendant's medical examiner, Ostermoor replied that he had consulted a physician "last night," or "a couple of nights ago," and that the physician's name was Dr. Endicott. The plaintiff also testified that the paper was not read over to Ostermoor. It could fairly be inferred, from all the testimony adduced by the plaintiff, that Ostermoor relied upon the medical examiner's honesty, and signed the paper in the belief that his answers had been accurately written down. The statements to which we have referred were entirely omitted from the application by the medical examiner. Here, again, there was a conflict of testimony; the medical examiner and Zimmerman denying that any of Ostermoor's statements were thus omitted. The question on that head was, however, fairly submitted to the jury, and they have necessarily found that the plaintiff's version of the matter is the truth. The rule applicable to the facts as thus found by the jury is well settled. Where the insured gives a truthful answer to a question put by the insurer's medical examiner, but the latter writes a different and untruthful answer, and the evidence authorizes a finding that the applicant did not see the answer as written, and was ignorant of the untruthful answer, the company, and not the insured, is responsible for the falsehood. Grattan v. Insurance Co., 92 N. Y. 275; Flynn v. Insurance Co., 78 N. Y. 568; Grattan v. Insurance Co., 80 N. Y. 281, 92 N. Y. 274; Insurance Co. v. Wilkinson, 13 Wall. 222.

As to the first specification, the defendant relies in part upon the certificate of Dr. Endicott accompanying the proof of death. He there states that the immediate cause of death was "cardiac insufficiency, with chronic nephritis, which I believe to have been dependent on the heart trouble." This statement was supplemented by an affidavit in which Dr. Endicott deposes that he first saw Ostermoor on the 11th day of November, 1895,—four days before the application was signed,—and that at that time he did not appear to be critically ill, but "in apparent fairly good health." This date corresponds with the doctor's testimony given upon the trial. Upon the assumption of the accuracy of Dr. Endicott's certificate, the defendant proved by a medical expert that the disease thus diagnosed, and from which Ostermoor was said to have died, "must have lasted for a very considerable length of time." The same expert testified that if a man had nephritis, with a complication of heart trouble, it might or might not be easily detected by examination, that it might require a great deal of skill to detect it, and that a man might die of such a thing without its ever being detected. The physician who examined Ostermoor for the company was also called by the defendant as a witness, and he testified that cardiac insufficiency was not strictly a disease, and that it could be called "heart failure"; also, that he examined Ostermoor's

urine when the application was signed, and that its normal weight, as then discovered by him, did not indicate any disease. He added that Ostermoor was then, to all appearance, a good, healthy man. In none of the questions put to Ostermoor in the application was he asked whether he was suffering from "cardiac insufficiency," or from "cardiac insufficiency with chronic nephritis," or from the latter "dependent on heart trouble." He was asked whether he had ever had any disease of the (a) heart, or (b) blood vessels. To which he answered, "No." He was also asked whether he had ever had (30) syphilis; (31) chancroid; (32) gonorrhea; (33) stricture; (34) (a) calculus, or (b) gravel; 35 (a) painful, (b) frequent, or (c) difficult urination; (36) colic, (a) renal, or (b) hepatic; (37) dropsy. To all these questions he answered, "No." He was then asked this question (38), which seems to have been put to cover what was left, or what might possibly have been previously omitted: "Any other disease of the (a) genital or (b) urinary organs?" To which he also answered, "No." The disease of which Ostermoor is said to have died, and for which he was treated by Dr. Endicott, was not shown to be included in any of the diseases enumerated in these questions 30 to 37, inclusive. Cardiac insufficiency is not necessarily a disease of the heart, within the sense of question 59; and chronic nephritis is not, eo nomine, specified in any of the questions. Doubtless, it comes within the general purview of question 38,—that is, any disease of the genital or urinary organs other than the last preceding lists of diseases. But it is impossible to treat so general a question as calling for a strict warranty as to every other possible disease of the urinary organs known to science or discoverable thereby. It is plain that such a question contemplated only the layman's fair and honest answer from what he knew or had reason to believe. But, even if the facts proved by the defendant were proper for the consideration of the jury upon the question of the breach of some specific warranty, there was no error in the submission. The defendant's motion to dismiss and for a direction was most general. There was no specification of any particular breach of warranty. There was therefore no error in the general submission of the case to the jury.

After a fair charge upon the general subject involved, the learned counsel for the defendant submitted several specific requests, but three of which call for special consideration. These were numbered 3, 4, and 4½; the latter two being those for the refusal to charge which the learned judge, in his opinion, indicates that he would grant a new trial. The third request was in these words:

"If the jury believes that the application expressly mentioned in the policy was intended by the parties to the contract to mean the application dated November 15, 1895, to which the signatures of Ostermoor and Dr. Winans were attached, then that application must be considered as part of the contract of insurance, in which event Ostermoor warranted to be full, complete, and true in every part all the answers which the jury find that Ostermoor gave to Dr. Winans in replying to the questions contained in such application."

The exception to the refusal to charge this proposition, as put, is untenable. The proposition was an abstraction. It asked the court to tell the jury that Ostermoor warranted his answers to be full,

complete, and true, but not what would amount to a breach, or what the legal consequences of such a breach would be. In other words, the proposition stated the postulate, but not the sequence. But, further, even the postulate was inaccurate, because it took in all the answers which Ostermoor gave,—not only those which may have been clear warranties, but those which were representations, and nothing more; as, for instance, the statement that Ostermoor was in perfect health, so far as he knew and believed. The request should have been limited to the particular warranties for the supposed breach of which the defendant claimed a verdict; that is, to those specific answers, the untruth of which the defendant had attempted to show by proving the particular disease already considered.

The fourth request read as follows: "If the jury finds that any of the answers made by Ostermoor, and which were warranted by him to be true, were not true, the verdict must be rendered for defendant." To this the court replied: "Unless the warranties which would therefrom arise have been waived or were waived." The defendant's counsel objected to the modification, stating that there was "no question of waiver, except this delivery; no claim of waiver of any of the warranties." To this the court rejoined, "Well, I will say 'estoppel,' then." The court was right in this last qualification. There was no question of waiver of any of the warranties, except as to the delivery of the policy. But there was, as we have already seen, a distinct question of estoppel in pais with regard to the answers to the eighty-first, eighty-second, and eighty-third questions. The proposition was also properly rejected for the reason that it ignored the question of fact as to whether the policy in suit was founded upon the original application. We have here the sequence without the postulate. The proposition should have been founded upon the same conditions as those stated in the preceding third request. It was also bad for generality; that is, as embracing every answer made by Ostermoor, and not merely those upon which the concrete proof had been given. The same observations apply to request numbered $4\frac{1}{2}$.

Complaint is also made of the court's treatment of a question put by a juror. This question was in these words: "When the plaintiff answered the questions asked of him, do I understand that if he was suffering from cardiac insufficiency, and not aware of it, would the answer that he had no such disease nullify this policy?" To this the court replied, "No; I do not think it would," to which ruling the defendant excepted. The question assumed that Ostermoor was asked whether he was suffering from cardiac insufficiency, which was not the fact. He was asked whether he had ever had any disease of the heart, and the evidence failed to show that cardiac insufficiency was such a disease. And, further, even the answer which he did give was not, when considered in its surroundings and context, a strict warranty. It was quite natural for this same juror to ask the learned judge, as he did subsequently, "How can a man guaranty the truth of a statement, unless he knows it?" There was no exception to the learned judge's remark in reply, "That is just what I rule." But, even if there had been an exception, the remark related solely to the concrete question which the juror had previously put, and which had

been properly disposed of. The remark was based, too, upon the juror's recollection of the summing up of the learned counsel for the defendant. This is evidenced by his observation, "Counsel has said that the man guaranties the truth of his statements." What counsel had said in his summing up which called for this comment is not disclosed. It may, for aught that appears, have related to statements which were mere representations, and the inquiry of the juror and the reply of the court may have referred solely to such representations. We think, therefore, that the defendant has shown no reversible error in the submission of the case or in the treatment of his requests.

The only other contention calling for special consideration is that the court erred in admitting the testimony as to Zimmerman's agreement to give Ostermoor an incontestible policy, free from conditions. This testimony was not offered to vary the terms of the policy. It was simply to show that the original application had been eliminated from the negotiation, and that the defendant was willing to give Ostermoor the policy in suit without any application.

Other assignments of error are made, but they are trivial and unsubstantial.

The order appealed from must be reversed, with costs. All concur.