SABIE LAKKA, as Guardian, etc., Appellee, v. MODERN BROTHERHOOD OF AMERICA, Appellant.

Fraternal insurance: INITIATION OF MEMBER: WAIVER OF RITUALISTIC
1 REQUIREMENTS. Where an application for membership in a fraternal insurance association had been passed upon by the physicians and approved by the proper officers of the association, and it was understood by both the insured and the officers of the association that the insurance should become effective on a certain date, and

acting in that belief dues were paid and accepted, it will be presumed that the preliminary ritualistic proceedings were complied with or waived; and the association will not be permitted to show, in defense of an action upon the certificate, that the insured was not properly initiated.

**Same:** FALSE REPRESENTATIONS: INTEMPERANCE: EVIDENCE. The statements of an applicant for fraternal insurance that he had never been intemperate in the use of malt or spirituous liquors, were not shown to be such false representations as constitute a breach of warranty, by evidence that he had been seen in the possession of whiskey, and that several years before his death he drank whiskey with the witness on different occasions; the other evidence showing that his habits were temperate and that he never used whiskey as a beverage.

**Same:** WARRANTIES: BREACH: EVIDENCE. The warranty in his application for fraternal insurance that insured was in good health should be construed as limited to his knowledge and belief; so that the statement of deceased that he had never had certain diseases of the heart and lungs was not breached by evidence that applicant died of a blood clot in the heart, and that a *post mortem* examination showed a congested condition of the lungs, in the absence of any showing that he knew he was afflicted with such diseases.

*Appeal from Mahaska District Court.*—HON. BYRON W. PRESTON, Judge.

THURSDAY, OCTOBER 23, 1913.

ACTION by the plaintiff, as guardian of minor beneficiaries, to recover the sum of $1,000 on a benefit certificate issued by the defendant to O. C. Lakka. Lakka died shortly thereafter. The plaintiff is his widow and her wards are his children. The benefit certificate is regular in form. It was delivered to the deceased on September 30, 1911. He died suddenly on October 8, 1911, from a blood clot in the heart. The defendant interposed three defenses, viz.: (1) That the deceased was not a member of the defendant order and that the benefit certificate sued on had never become effective for that reason. (2) That certain representations

of the deceased as to his previous state of health were false and constituted a breach of warranty. (3) That certain representations of the deceased as to his habits in relation to the use of intoxicating liquors were false and constituted a breach of warranty. At the close of the evidence the plaintiff moved for a directed verdict, and her motion was sustained. Judgment being entered upon verdict for plaintiff, the defendant has appealed. *Affirmed.*

*C. C. Dowell* and *W. H. Keating,* for appellant.

*Dan Davis* and *McCoy & McCoy,* for appellees.

EVANS, J.—The first issue discussed by appellant is the first above stated. Was the certificate invalidated for want of certain formalities in initiating the deceased into membership of the local lodge? The certificate purported to be issued to the deceased as a member of the local lodge at Oskaloosa known as No. 908.

It appears that a state deputy, Mrs. Frank, had been sent to Oskaloosa to revive and reorganize the local lodge and she spent some weeks in such work. More than forty new members were secured as the fruit of her work, of which Lakka was one. The duty of a deputy is not very clearly set forth in the by-laws of the defendant. Our attention is especially directed to the following sections of such by-laws:

Sec. 237. *Supreme President, Shall Appoint and Remove.* The Supreme President shall have authority to appoint and remove deputies and prescribe rules for their government, and the board of directors shall establish their compensation.

Sec. 239. *Authority to Organize Lodges, Where.* Deputies shall have authority to organize subordinate lodges within their respective territory, and to perform such other duties as may be required of them by the Supreme President. They shall not organize new lodges unless fifteen applicants for beneficial membership who have complied with these by-laws and who are acceptable in every respect petition for charter.

Sec. 242. *Secretary Shall Report Applicants Initiated.*
The local secretary shall certify to the Supreme Secretary on
blanks furnished for that purpose the names and numbers of
applicants initiated by the deputy's solicitation and labors.

Sec. 243. *May Work in Lodges with less than Fifteen
Members, When.* When a lodge has less than fifteen beneficial
members a deputy may be authorized by the Supreme Presi-
dent to visit the same and solicit members therefor on the same
terms as though no lodge existed at the place in question, for
a period not to exceed thirty days, and this may be done with-
out any resolution on the part of said lodge, or without any
agreement with any of its officers: Provided, further, that
the Supreme President may, when in his judgment such a
course is necessary, authorize any deputy to work for an old
lodge and may make such terms with him as to his compensa-
tion as he sees fit, and the lodge cannot question any arrange-
ment so made nor can the lodge in such case claim any part
of the membership fee.

Section 134 of such by-laws is as follows:

Sec. 134. *Benefit Certificate Takes Effect, When.* The
liability of this society for the payment of benefits upon the
death or injury of a benefit member, shall not begin until all
the acts, qualifications and requirements prescribed for the
applicant in all the laws, rules and regulations and ritual of
the society shall have been fully complied with by him, and
until all acts therein prescribed for the subordinate lodge shall
have been fully complied with by it and until his application
shall have been fully approved by a subordinate lodge physi-
cian and Supreme Physician, and a benefit certificate issued
as provided in these by-laws, and delivered to applicant while
in good health, nor until said applicant shall have been
adopted, initiated and obligated by the proper subordinate
lodge.

Mrs. Frank took from Lakka on September 26, 1911, an
application for membership in the order and for insurance.
On the same day the lodge physician examined the appli-
cant and approved the application. On September 27th the
Supreme Lodge physician did likewise. The application with

the approval of both physicians was sent to the Supreme President and Secretary, and these issued the benefit certificate thereon on September 29th and sent the same to the President and Secretary of the local lodge at Oskaloosa, who countersigned the same.  On September 30th it was presented to Lakka, who accepted the same and signed the obligation thereof as a member.  Some brief ritualistic form was performed by Mrs. Frank, and the benefit certificate was on the same day delivered to Lakka.  On the same day record was made on the books of the local lodge showing the adoption of Lakka into membership on said day.  Lodge dues of 20 cents and a current assessment of 75 cents and a membership fee of $3 were then and there collected from Lakka by Mrs. Frank and the officers of the local lodge.

The benefit certificate came to the local lodge from the Supreme Officers, with the following instructions attached: "Dear Secretary:  If this certificate is not placed in force, by applicant being *adopted, obligated or initiated* on or before Sept. 30th, 1911, it must be returned to the undersigned at once without fail.  This certificate cannot be placed in force after September 30th, 1911.  Fraternally, E. T. Balz, Supreme Secretary."

1. FRATERNAL INSURANCE: initiation of member: waiver of ritualistic requirements.

The defense is predicated at this point upon the claim that there was some failure or defect in the ritualistic forms attending the initiation of Lakka, and that he was not initiated according to the forms required by the by-laws of the association, and that he was not initiated in so-called open lodge.  The contention is that these defects rendered all other proceedings nugatory and that Lakka therefore never became a member.  To accede to this contention would be to permit the extensive ritualistic forms of the defendant to become the ready means of actual fraud upon prospective members, accepting solicitations to membership extended to them by appropriate officers, and paying to such officers the appropriate fees upon assurances of

their complete adoption as members. Not only did the local lodge show upon its records September 30, 1911, the complete adoption of Lakka into membership but such lodge by its officers after the death certified to his membership and to his good standing. It is urged, however, that the local lodge exceeded its authority. It will be noted, however, that the acts of Mrs. Frank, the deputy, and of the officers of the local lodge were in strict accord with the written instructions attached to the benefit certificate by the Supreme Officers. The certificate was issued at Mason City September 29th. The instructions from the Supreme Officers required that it should be put in force not later than September 30th and that the method of such putting in force be, "Being adopted, obligated *or* initiated." Concededly Lakka accepted and adopted the certificate and obligated himself to membership by his own signature thereon. The only question raised is: Was he properly initiated? By the alternative form of the above requirements, formal initiation was not required at all if the certificate was otherwise adopted or obligated.

In the absence of fraud, we think that the conduct of the lodge officers and the record made by them should be deemed conclusive on the question of completed membership regardless of mere defect of form in the proceedings leading up to such membership. The substance of every requirement of the by-law was complied with. The applicant understood that he was becoming a member of the order. His application was passed upon by the physician and appropriate officers of the order and was approved by them. They understood that he was becoming a member. Both the applicant and the officers understood on September 30th that by the proceedings of that day he had become a full member. In such belief the fees and dues were collected from the applicant and have been retained ever since. To open up now the ritualistic proceedings to an investigation of their regularity would be shocking to the judicial sense. We think, therefore,

as already indicated, that upon the facts shown it should be conclusively presumed that all preliminary requirements were substantially complied with or were waived. That such provisions could be deemed waived in an appropriate case has been settled by our previous holdings: *Warnebold v. Grand Lodge,* 83 Iowa 26; *Moore v. Order of Railway Conductors,* 90 Iowa 721; *Watts v. Equitable M. L. Ass'n,* 111 Iowa 90; *Thornburg v. Life Association,* 122 Iowa 260; *Trotter v. Grand Lodge,* 132 Iowa 513; *Krause v. Modern Woodmen,* 133 Iowa 199; *Collver v. Modern Woodmen,* 154 Iowa 615. To the same effect are the following cases from other jurisdictions: *Kidder v. S. C. U. O. of G. C.,* 192 Mass. 326 (78 N. E. 469, at page 471); *Wagner v. Supreme Lodge Knights & Ladies of Honor,* 128 Mich. 660 (87 N. W. 903, at page 904); *Supreme Ruling of the Fraternal Mystic Circle v. Crawford,* 32 Tex. Civ. App. 603 (75 S. W. 844); *Shackelford v. Supreme C. K. of D.,* 98 Ga. 295 (26 S. E. 746, at page 748).

II.    It is next urged that the insured made false representations which constituted a breach of warranty in relation to his use of intoxicating liquors. The contention is based upon the following questions and answers in

2. SAME: false representations: intemperance: evidence.

Lakka's application for membership: "Have you ever been intemperate in the use of either malt or spirituous liquors, or used any drug habitually? A. No. Do you use either malt or spirituous liquors daily or nearly every day? A. Glass of beer occasionally. If so, what is used and the approximate amounts? Answer explicitly. A. Beer. Have you ever taken any cure or treatment for liquor or any other habit? A. No."

It is urged that there was some evidence tending to show the falsity of the above representations and that therefore the trial court should not have directed a verdict for the plaintiff. The defendant introduced three witnesses on this question. One witness testified that he had seen "full bottles of whisky" in Lakka's office but had never known him to drink any. Another witness testified that he had known Lakka to drink

whisky some three years before his death. Clearly there is nothing contradictory in the testimony of either of the above witnesses. Reliance, however, is placed on the testimony of witness Hourihan who testified as follows:

I have known Mr. Lakka for two years. Saw him when I was on the road every day. He was connected with the Iowa Central Railroad. Since leaving the road I have seen him once or twice a month anyway. We were pretty well acquainted. We have drank together in the Rock Island saloon, and also he has given me money when he was on duty. He was afraid to go into the saloon to get him some liquor. I saw him drink whisky about the 1st of August, 1911, out by the ball park and the artificial ice plant. He had a half pint of whisky in his pocket and gave me a drink out of it, and I drank with him and he went on east on the Iowa Central. I saw him drinking whisky in Hedrick when I was braking on the local. He had it in a bottle. He had a pint at one time and when out at the button factory he had a half pint. I saw him north of Roesch's saloon. He had a bottle of sealed goods, bonded goods, and he helped me drink the beer, and drank the whisky too. He put the bottle in his pocket. I saw him drinking whisky in the Rock Island saloon. I met him pretty frequently in the last year of his life; pretty near every time he would see me he would ask me to have a drink with him, and we would drink together. Sometimes he carried the liquor on his person and sometimes went into a saloon to drink it. But he would not go into a saloon; he was afraid of the superintendent. The whisky he had in his pocket in a bottle, but I do not know where he got that, but he drank over the bar with me. We drank together over the bar. (Cross-examination:) I have been convicted of a felony.

. So far as the drinking of beer is concerned, it is in accord with the answer made by Lakka to the second interrogatory as heretofore quoted. The contention is that the answers of Lakka amounted to a denial that he ever drank any whisky and that the testimony of Hourihan showed that he had drank whisky on at least three or four occasions. We find nothing in the above answers of Lakka which amount to a denial that

he had ever drank whisky.  His first answer was a denial that
he had ever been *"intemperate* in the use of either malt or
spirituous liquors.''  No attempt was made on the trial to show
that his use of whisky was intemperate within the ordinary
meaning of the term.

Taking the second question and answer in the application,
it amounts to an admission by Lakka that he drank beer ''daily
or nearly every day.''  The testimony of Hourihan is consis-
tent with this answer so far as the subject of beer is concerned.
We think, therefore, that the trial court did not err in refus-
ing to submit this question to the jury.  The jury could not
have found upon this testimony false representation or breach
of warranty.  In point here, see *O'Connor v. Modern Wood-
men of America,* 110 Minn. 18 (124 N. W. 454, at page 455, 25
L. R. A. (N. S.) 1244) ; *Rupert v. Supreme Lodge,* 94 Minn.
293 (102 N. W. 715) ; *Insurance Co. v. Foley,* 105 U. S. 350-
355 (26 L. Ed. 1055) ; *Supreme Lodge v. Foster,* 26 Ind. App.
333 (59 N. E. 877) ; *Insurance Co. v. Simpson* (Tex. Civ.
App.) 28 S. W. 837 ; *Grand Lodge Belcham,* 145 Ill. 308 (33
N. E. 887) ; *Chambers v. Insurance Co.,* 64 Minn. 495 (67 N. W.
367, at page 369, 58 Am. St. Rep. 549).

It should perhaps be stated here that evidence on behalf
of the plaintiff was overwhelming to the effect that the de-
ceased never used whisky as a beverage and that his habits
were in all respects temperate.

III.   It is next urged that there was breach of warranty
in the representations made by Lakka as to his state of health.
Lakka in his application answered that he had never had
"pleurisy, pneumonia, or disease of the
heart.''  It is urged that these statements
were literally untrue, although it is not
claimed that the deceased knew them to be so.  The alleged
warranty made by the deceased is set out by the defendant
in his answer as follows:

3. SAME: war-
ranties:
breach: evi-
dence.

I declare and warrant that I am to the best of my knowl-
edge and belief in sound health and physical condition, and

that the above statements, together with the statements and answers made or to be made by me in other parts of this application, are literally true.   I further agree that any untrue statement or answer, or any concealment of fact, intentional or otherwise, in this application (including the succeeding parts hereof), or my failure to pay any funds, dues, or assessments required by said Modern Brotherhood of America, and within the time herein provided, or my being suspended or expelled from said society, shall forfeit the rights of myself and my beneficiary or beneficiaries to any right and all benefits to be derived from my membership in said society.

The testimony introduced by the defendant and relied upon as showing breach of above representation is that of Dr. Abbott, who attended the deceased at the time of his death. ' From the testimony of this witness it appears that he was not able to diagnose the cause of death at the time but ascertain the same by *post mortem* examination.   The autopsy revealed to him that a blood clot in the chamber of the heart was the cause of death.   He also found a congested lung and evidences of pleurisy.   He was unwilling to say whether such condition was of long standing or not.   Indeed, he frankly conceded that it might have developed within twenty-four hours preceding the death.   And this was particularly so in his opinion as to the blood clot which caused the death.   There was also the testimony of one witness that on one or two occasions the deceased complained of a "catch" in his side.   We think this evidence was not sufficient to justify submission to the jury of the question whether the deceased had prior to his insurance ever had "pleurisy, pneumonia, or heart disease."

If the evidence were sufficient for such purpose, and if the finding were made that the answers were untrue in fact, it would be insufficient to defeat the plaintiff in the absence of bad faith in making such answers.   It will be noted from the quotations above made that the deceased declared and warranted himself to be sound and in good health "to the

best of my knowledge and belief.'' There is no claim by the defendant that there is any evidence of bad faith on the part of the deceased. We do not overlook the fact that the warranty is repeated a number of times throughout the application, and that it is very sweeping in form, and that it is so repeated without the qualification which we have noted. We think nevertheless that such qualification should be deemed to run with the declaration wherever repeated. Otherwise such qualification is without any function or effect whatever. Indeed, if the qualification were wholly absent, we are impressed with the view that the legal effect of the declaration of warranty would still be the same and that we could not give to these words the literal and absolute effect contended for by the defendant. The contention is that he warranted himself in sound health and that such warranty would be breached by the existence of infirmities, regardless of the knowledge or good faith of the insured. To so hold would be to require the insured to insure himself and to guarantee his own natural expectancy of life and to forfeit his insurance after death if death came too soon. If such a provision were enforceable regardless of good faith of the insured, and regardless of his knowledge of hidden infirmities, no person could know whether he was insured or not. Such question could be determined to a certainty only by an autopsy. To introduce into life insurance such an element of uncertainty would be contrary to the spirit and purpose of it and contrary therefore to public policy. This is the direction indicated by our previous cases: *Sieverts v. Benevolent Ass'n,* 95 Iowa 710, at pages 716-717; *Peterson v. Des Moines Life Ass'n,* 115 Iowa 668, at page 672; *Sargent v. Modern Brotherhood,* 148 Iowa 600, 607-608. See, also, *S. R. of the F. M. C. v. Crawford,* 32 Tex. Civ. App. 603 (75 S. W. 844), from which we quote as follows: ''It seems to us that the answer of an applicant for life insurance upon his own life that he has never had any serious illness should be considered as a mere expression of opinion as to

the character of the sickness and should not avoid the policy, even though such answer was untrue, provided, of course, the applicant did not know of its falsity.. The form of the question necessarily calls for an opinion, and an agreement to warrant the truthfulness of the answer is no more than to warrant that the applicant will make a *bona fide* answer as to his opinion of the character of his ailment. See *Hogle v. Insurance Co.*, 29 N. Y. Super. Ct. 567; *Illinois Mas. Ben. Soc. v. Winthrop*, 85 Ill. 537; Bacon, Ben. Soc. section 234."

Under the record in this case we do not hesitate to hold that the warranty of the insured extended no further than a declaration of his honest belief. We may note also that the evidence is undisputed in this case that the deceased had not lost a day by reason of sickness in the last ten years and that a careful examination by the lodge physicians failed to reveal any infirmity whatever. The trial court therefore properly refused to submit this issue to the jury.

The verdict was properly directed, and the judgment is therefore *Affirmed.*

WEAVER, C. J. and LADD and GAYNOR, JJ., concur.