# Richmond.

## GREENWOOD V. ROYAL NEIGHBORS OF AMERICA.

### January 13, 1916.

### Absent, Cardwell, J.

1. DEMURRER TO EVIDENCE—*What Jury Might Have Found—Case at Bar—Insurance.*—Upon a demurrer to the evidence by the defendant, the court must accept as established by the plaintiff whatever the jury as reasonable men might have concluded from the evidence, and as, in the case at bar, the jury might have found from the evidence that the family physician of the assured had never told her or her husband that she had an incurable and dangerous disease of the heart, the court must so hold. Questions of this character, whenever there is any discrepancy in the testimony or doubt as to its meaning, should be left to the jury.

2. INSURANCE—*Benefit Societies—Favorable Construction of Policy.*—Fraternal benefit societies, while usually dealt with more liberally in some respects than ordinary insurance companies, are subject to the same rules of law and construction as other companies in regard to their contracts for life insurance. The beneficiary in each case is entitled to a liberal and favorable interpretation of the contract.

3. INSURANCE—*Warranty—Representation—Good Health—Latent Disease.*—The statement of an assured in an application for reinstatement, whether regarded as a warranty or as to representation, that he is "in good health," imports no more than an honest statement of the nonexpert opinion of the delinquent member as to the state of his health. The answer called for and accepted in such case, without medical examination, is primarily and essentially a matter of opinion. The phrase, "good health," as used in its common and ordinary sense by a person speaking of his own condition, undoubtedly implies a state of health unimpaired by any serious malady of which the person himself is conscious. He does not mean that he has no latent disease of which he is wholly unconscious. If by the phrase "good health" an insurance company desires to exclude every disease, though latent and unknown, it must do so by distinct and unmistakable language.

Error to a judgment of the Law and Equity Court of the city of Roanoke in an action of *assumpsit.* Judgment for the defendant. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*R. H. Willis,* for the plaintiff in error.

*Poindexter & Hopwood,* for the defendant in error.

KELLY, J., delivered the opinion of the court.

This case is here upon a writ of error to a judgment rendered against the plaintiff in the court below on a demurrer to evidence by the defendant.

On the 8th of December, 1904, the Royal Neighbors of America, a fraternal beneficiary society, accepted Laura C. Greenwood as a member and issued to her a benefit certificate (or life insurance policy) in which her husband, Thos. C. Greenwood, was named as beneficiary. From that time until January, 1913, she kept her monthly dues paid, with an occasional temporary delinquency which in each instance was made good and which in no instance was the subject of any question. She failed to pay in January, 1913, but in the following month paid up in full, and thereafter kept up her dues until her death in April, 1913.

The certificate, read together with the by-laws which were made a part thereof, provided that failure to pay any monthly assessment should operate to suspend the holder from membership in the society; that during such suspension the certificate should be void, and that the member so suspended might be reinstated "by the payment, within sixty days from the date of suspension, of all arrearages  .  .  .  provided, however, that said member is in good health at the time of such action to reinstate, and that whenever assessments are so tendered by a

member for the purpose of reinstatement, such tender shall be construed and held as a full warranty by said member that he or she *is then in good health.*" (Italics ours.)

At the date of Mrs. Greenwood's action for reinstatement, and from that time until the night before her death, she appeared to be in perfect health. From the middle of December until the latter part of February she suffered from an attack of grippe, which is not claimed to be material, and with that exception there is no evidence to show that there was anything in her condition to indicate ill health. The inference is that she was apparently well, from the fact that her family physician, Dr. Jamison, had not attended her for any purpose for about three years prior to her death. He had, however, about four years prior to her death, been consulted by her and found that she had what he said was, "to the best of his knowledge," valvular heart disease, and thereafter he "saw her off and on during that year." In her last illness Dr. Gill first attended her because Dr. Jamison was not at the time available. This was early in the morning of the day of her death. Her illness, as Dr. Gill thought, from the manner in which she was suffering, was acute indigestion. He gave her temporary relief, but made no physical examination, and did not see her again, Dr. Jamison taking charge of the case later. She died late in the afternoon of the day on which she became ill. Dr. Jamison testified that she died of valvular heart disease; that this is an incurable disease, and that he would say, therefore, that she had it in January and February, 1913.

The ground upon which the defendant rested its demurrer to the evidence was the alleged breach of a warranty that Mrs. Greenwood was "in good health" when she paid up her arrearages. The first question arising in regular order upon this contention turns upon the effect of Dr. Jamison's testimony. All of the evidence given by him must be viewed in the light of the following facts and circumstances, some of which have already appeared, to-wit: His original diagnosis, which was

inherently and essentially a matter of opinion, was moreover stated by him to be "to the best of his knowledge." Although he was her family physician, he seems not to have informed her of his opinion, and he never had occasion to treat her for any trouble for three years prior to her death. Dr. Gill, who saw her in the incipiency of her last illness, thought she had acute indigestion. Her husband testified that she had appeared to be in perfect health. In this state of the evidence, we are not prepared to say that the jury were bound to accept Dr. Jamison's opinion as to the condition of her health in February, 1913. On behalf of the plaintiff in error much stress is laid on the fact that Dr. Gill says he made no examination of Mrs. Greenwood when he saw and treated her, but it is also true that Dr. Jamison does not state that he at any time made a physical examination. He says that she came to him, four years before her death, "suffering with palpitation of the heart and unable to get her breath properly on the least exertion." In other words, so far as their statements show, both physicians based their opinion on subjective symptoms. If Dr. Jamison, the family physician for years, was positively satisfied four years before her death that Mrs. Greenwood had an organic heart disease which, as his testimony plainly shows, might, with proper care and precaution, cause her no particular inconvenience and not affect her natural expectancy of life, and which, on the other hand, by indiscretion in diet or exercise, might produce her death at any moment, it is inconceivable that he would not have told both her and her husband of that fact, and yet the jury would have been justified in believing from the evidence that he did not tell them. It seems clear from Mr. Greenwood's evidence that he did not know it, and Dr. Jamison was not questioned upon this vitally important point by the defendant, whose witness he was. The point was vital because if he did not communicate his opinion to his patient it cannot be thought that he was sure of his diagnosis. (It was also vital because of its bearing upon the construction and effect of the

alleged warranty, discussed in the second branch of this opinion.)   Upon this demurrer the court must accept as established by the plaintiff whatever the jury as reasonable men might have concluded from the evidence.   It was a reasonable inference that Dr. Jamison had never told either Mr. or Mrs. Greenwood that the latter had an incurable and dangerous heart disease, and that his reason for not doing so was that he himself had not originally regarded her trouble as being of serious consequence.   If this be true, then of course his opinion is not conclusive.

Questions of this character, wherever there is any discrepancy in the testimony or doubt as to its meaning, should be left to the jury.   May on Insurance, sec. 296;   *Boos* v. *World Mutual Life Ins. Co.,* 64 N. Y. 237, 241;   *Moulor* v. *Ins. Co.,* 101 U. S. 708, 710, 25 L. Ed. 1077;   17 Cyc. 262.

We feel that we might safely rest the decision upon what has already been said, but there is another view of the case which is conclusive against the defendant, and which we consider of sufficient general importance to call for its discussion.   The jury, in our opinion, might properly have found that there was no breach of warranty, even if they had been bound to accept Dr. Jamison's theory of the case.

Fraternal benefit societies, while usually dealt with more liberally in some respects than ordinary insurance companies, are subject to the same rules of law and construction as other companies in regard to their contracts for life insurance.   Vance on Insurance, sec. 30, p. 59.   The beneficiary, therefore, is entitled to a liberal and favorable interpretation of the contract. Vance on Insurance, p. 430;   *Stratton* v. *N. Y. Life Ins. Co.,* 115 Va. 257, 270, 78 S. E. 636.

Construed in the light of these principles and of the authorities which commend themselves to us as being based upon reason and justice, we are of opinion that the case is with the plaintiff in error, even if it be conceded that Dr. Jamison's diagnosis was correct.   This we think is true irrespective of whether the

automatic provision of the by-laws, heretofore quoted, relative to the "good health" of the insured be regarded as a warranty or as a representation.   The jury, we have seen, might well have found from the evidence, and, indeed, could hardly have failed to find, that Mrs. Greenwood did not know that her health was seriously impaired.   The by-law in question contemplates a reinstatement of delinquent members, if they pay up within sixty days, without any medical examination, and it is a fair and reasonable conclusion that the language of the by-law, which is automatically ascribed to them' every time they are for any part of this brief sixty-day period in arrears, imports no more than an honest statement of the non-expert opinion of the delinquent members as to their state of health.   The answer called for is primarily and essentially a matter of opinion.   The phrase "good health," as used in its common and ordinary sense by a person speaking of his own condition, undoubtedly implies a state of health unimpaired by any serious malády of which the person himself is conscious.   When one says he is in good health, he does not mean, and nobody understands him to mean, that he may not have a latent disease of which he is wholly unconscious.   It is doubtless competent for a life insurance company, in its policies, to take the expression "good health" out of its common meaning and make it exclude every disease, whether latent and unknown or not (assuming that any person would ever accept a policy of that kind), but it must do so in distinct and unmistakable language.   The mere statement by a party that he fully warrants himself to be in good health is not sufficient.

"Good health means apparent good health, without any ostensible, or known, or felt symptom of disorder, and does not exclude the existence of latent unknown defects."   May on Ins., sec. 295, p. 625.

In *Schwarzbach* v. *O. V. P. Union,* 25 W. Va. 622, 657, 52 Am. Rep. 227, 233, Judge Green, after first approving the well settled rule that the term "warranty" does not in itself neces-

sarily convert an expression of opinion into an affirmance of a fact, says: "But sometimes facts are stated by the insured, which the insurer must from the nature of the fact stated have known were not stated as facts absolutely true and within the personal knowledge of the insured. When the fact stated is of this description, on the principles we have laid down, the policy should not be avoided merely because the statements turn out afterward to be in point of fact untrue, if the statement was made in perfect good faith and with the full belief, when the statement was made, that it was true. Of this character would be a statement in an application that the insured was of 'sound body;' for of course the insurer must have understood such a statement as made not upon the personal knowledge of the insured, but upon his belief from all the knowledge he had of his constitution. For of course men sometimes believe they are of 'sound body,' when in point of fact they have some 'internal disease,' which in its character is fatal. When such a statement as this is made in an application for a life policy on the principles we have laid down the policy is not forfeited, if the statement turns out to be untrue, if, when it was made, the insured believed that he was of 'sound body' and had no suspicion that he was the subject of an 'internal disease' fatal in its character."

Assuming, as we do for the sake of this discussion, that Mrs. Greenwood did have valvular heart disease when she sought reinstatement, and, assuming further, as we must upon this demurrer to evidence, that she did not know it, the case is not, so far as she and her beneficiary are concerned, different from what it would have been if she had been affected by some disease which was not discovered or even discoverable otherwise than by a *post-mortem* examination. It certainly cannot be contended with any show of reason or authority that in such a case an insurance policy could be defeated by the mere statement of the insured that he warranted himself in good health. The warranty would have to go further, and in unmistakable terms

provide against unknown impairment of health.  As was said by Mr. Justice Harlan in *Moulor* v. *American Life Ins. Co.*, 111 U. S. 336, 341, 4 Sup. Ct. 466, 469 (28 L. Ed. 447): "In the absence of explicit, unequivocal stipulations, requiring such an interpretation, it should not be inferred that a person took a life policy with the distinct understanding that it should be void and all premiums paid thereon forfeited, if at any time in the past, however remote, he was, whether conscious of the fact or not, affected with some one of the diseases mentioned in the question to which he was required to make a categorical answer.  If those who organize and control life insurance companies wish to exact from the applicant, as a condition precedent to a valid contract, a guaranty against the existence of diseases, of the presence of which in his system he has and can have no knowledge, and which even skillful physicians are often unable, after the most careful examination, to detect, the terms of the contract to that effect must be so clear as to exclude any other conclusion."

Whether the language be that of a warranty or a representation, "Where the answer of the applicant is made in good faith and relates to an unknown and obscure disease, or to a long list of diseases, some of them obscure, the courts are disposed to construe the answer as relating to matter of opinion of the applicant rather than to matter of fact."  Richards on Ins. (3d Ed.) 482.

In *Blackman* v. *U. S. Casualty Co.*, 117 Tenn. 578, 103 S. W. 784, the application of the insured contained this preliminary clause: "I hereby apply for a health insurance policy, to be based on the following statements, which I warrant to be complete and true;" and one of the statements referred to was this: "I am . . . free from any . . . constitutional, functional, or organic diseases, . . . impairment or infirmity."  It developed that, unknown to him, he was then in the first stages of nephritis, a serious kidney disease which was

one of the diseases specifically insured against in the policy. It was held, citing a long line of Tennessee decisions, that the answer did not avoid the policy, the court in its opinion saying that, "a statement concerning one's bodily condition with respect to obscure or undeveloped disease would be a mere matter of opinion, and that the insured would not be responsible for a misrepresentation as to such a matter, unless he had reason to believe that the representation was false."

In *Owen* v. *Metropolitan Life Ins. Co.,* 74 N. J. Law 770, 67 Atl. 25, 122 Am. St. Rep. 413, certain statements and answers were made warranties by the terms of the policy. Among these was a statement by the insured that he had never had certain specified diseases, including "disease of the heart." There was evidence tending to show that a man of the same name as the insured had, previous to the date of his policy, been for two months in a hospital under treatment for organic heart trouble. The identity of the hospital patient with the insured was questioned, but the opinion, which was delivered by the present Mr. Justice Pitney, assumed that there was sufficient evidence of identity to carry the matter to the jury, and (with striking pertinency to the instant case) held as follows: "The declaration in paragraph 2 of the application, to the effect that the applicant had never had disease of the heart, an obscure disease, concerning which the insurer should know that the applicant could not have certain knowledge saving as he might be told by a physician or other expert, is properly to be construed as a warranty only of the *bona-fide* belief and opinion of the applicant. *Henn* v. *Metropolitan Life Ins. Co.,* 67 N. J. Law 310, 51 Atl. 689; *Dimick* v. *Metropolitan Life Ins. Co.,* 69 N. J. Law 393, 55 Atl. 291, 62 L. R. A. 774. Since the case is devoid of evidence to show that Owen was apprised that he was suffering from heart disease, beyond the mere fact that he was so suffering, it certainly was not conclusively proved that his *bona-fide* belief and opinion upon the subject were

otherwise than as warranted, and so a verdict could not properly be directed in favor of the defendant on this ground, even if the identity of Owen the insured with Owen the patient had clearly appeared."

See, also, *Minnesota Life Ins. Co.* v. *Link,* 230 Ill. 273, 82 N. W. 637; *Fidelity Mutual Life Ins. Co.* v. *Jeffords,* 107 Fed. 402, 46 C. C. A. 377, 53 L. R. A. 193; *Ames* v. *Manhattan Life Ins. Co.,* 40 App. Div. 465, 58 N. Y. Sup. 244, affirmed 167 N. Y. 584, 60 N. E. 1106; *Lakla* v. *Modern Brotherhood,* 163 Iowa 159, 143 N. W. 513, 517, 49 L. R. A. (N. S.) 902.

The case of *Bixler* v. *Modern Woodmen,* 112 Va. 678, 72 S. E. 704, 38 L. R. A. (N. S.) 571, so much relied upon by defendant in error, is not at .all in conflict with, but rather tends to support the conclusion which we have reached. In that case the opinion brings out and emphasizes the fact that when the insured, Bixler, paid up his dues for reinstatement, he knew that he had been suffering from chronic diabetes for two years or more.

Our conclusion is that while it may not have been true that Mrs. Greenwood was free from a serious and dangerous organic heart trouble at the time, her statement that she was "in good health" was true in the sense in which her beneficiary is entitled to have the expression construed, and, therefore, that whether her statement be regarded as a warranty or as a representation, the result is the same and the beneficiary is entitled to recover on the certificate. This we think follows, not from all, but from the best considered authorities on the subject, and it seems to us to be the right of the case.

. The judgment complained of will be reversed, the demurrer to the evidence overruled, and judgment entered in this court for the plaintiff.

*Reversed.*