# 𝕾𝖙𝖆𝖚𝖓𝖙𝖔𝖓

## MUTUAL BENEFIT HEALTH AND ACCIDENT ASSOCIATION, A CORPORATION v. ARTHUR V. RATCLIFFE.

September 20, 1934.

Present, Campbell, C. J., and Holt, Epes, Browning and Chinn, JJ.

The opinion states the case.

*O. M. Vicars* and *Joseph M. Sanders,* for the plaintiff in error.

*Morton & Parker,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

We shall designate the parties as they stood in the trial court.

On April 12, 1929, the plaintiff, Ratcliffe, applied for a health and accident policy in the defendant company. That application was in writing. The policy itself issued on May 1, 1929. In the latter part of 1930 it was permitted to lapse for non-payment of premiums. The insured assigned as a reason for this the fact that it provided for the payment of only one month's indemnity for non-confining total disability. In March, 1930, Mr. Hopkins, who represented the company, called upon him and talked over the situation. He explained that by the payment of an additional premium of $1.50 quarterly an endorsement would be placed upon the policy providing for the payment of monthly indemnity for non-confining illness as long as such illness continued. And on March 31st Hopkins wrote to Ratcliffe saying:

"I will be very pleased to reinstate your policy for you. I note that you want a non-finding rider attached to your policy at a cost of an additional $1.50 per quarter.

"Please send me your old policy with a remittance of $14.50, and I will be glad to attend to same for you."

■ On April 6, 1931, the company claims that Ratcliffe made another application in writing to it, and on April 9, 1931, another policy was executed and sent to the beneficiaries. It contains the same provisons as to payments and conditions under which they are to be made as appear in the policy of May, 1929, and in addition had thereon a rider for the payment of monthly indemnity for non-confining illness so long as the same should continue upon the payment of said additional premiums. Plaintiff contends that he never signed the application of date April 6, 1931, and testified to that effect. J. M. Hopkins said that he did. It is a matter of no moment. The purported application is attached to and made a part of the policy delivered, accepted and here declared upon. It cannot now be repudiated. *Provident Relief Association* v. *Butts,* 158 Va. 259, 163 S. E. 66; *Mutual Life Ins. Co.* v. *Hilton-Green,* 241 U. S. 613, 36 S. Ct. 676, 60 L. Ed. 1202.

On January 26, 1932, plaintiff applied for payment of those benefits which he claimed the policy promised and said that his illness was due to "nervous breakdown, heart trouble." Payment was refused, hence this action.

■ The company, by way of defense, contends that there were material misrepresentations made in the application; that the policy did not cover the illness suffered in that it was due to a malady existing and concealed when issued, and that the jury was misinstructed.

We think that the new policy was, as plaintiff claims, but a reinstatement of the old, but whether it be that or an entirely new contract cannot affect the results. The reinstatement was subject to conditions named in the policy delivered. One reinstated looks to the future. Such rights as might have ripened while suspended are lost to the insured. It cannot in reason be contended that this second

policy promised to pay indemnity for known disabilities then existing. One might as well claim under a life policy issued to a dead man. These applications are in all material respects the same. In that of 1929 this appears:

"9. Has any application ever made by you for life, accident or health insurance been declined? Answer as to each. *No*. Has any life, accident or health policy issued to you been cancelled? Answer as to each. *No*. Has any renewal of a life, accident or health policy been refused by any company or association? Answer as to each. *No*. If so, give full particulars.

"10. Have you ever made claim for or received indemnity on account of any injury or illness? If so, give companies or associations, dates, amounts and causes. 1926. Accident, B. A. R. E.

"11. Are you sound physically and mentally? Answer as to each. *Yes*. Are you maimed or deformed? Answer as to each. *No*. Have you any impairment of sight or hearing? Answer as to each. *No*. Have you ever had a hernia? *No*. Are your habits correct and temperate? *Yes*.

"12. Have you ever had any of the following diseases: Rheumatism? *No*. Epilepsy? *No*. Diabetes? *No*. Heart Disease? *No*. Any disease of the brain or nervous system? *No*.

"13. Have you ever received medical or surgical advice or treatment or had any local or constitutional disease within the past five years? Answer as to each. No. *Yes*. See No. 10. Fully recovered. In (Year and Month) . . . . . . . . . for . . . . . . . . . . lasting . . . . . . . . . . In (Year and Month) . . . . . . . . . for (Nature) . . . . . . . . . lasting (State duration) . . . . . . . . . ."

On March 26, 1919, the Maryland Casualty Company issued to plaintiff an accident and health policy which that company cancelled on December 20, 1920, after having paid on it $550 for heart trouble, $28.33 for boils and $85 for influenza.

On October 18, 1922, the National Casualty Company of Detroit issued to him an automobile accident policy. Under

it he was paid $25 for an automobile accident. This policy was cancelled by the company on April 27, 1923. $53.50 benefits was paid under this.

On February 21, 1924, he applied to the Iowa State Traveling Men's Association of Des Moines, Iowa, for a health and accident policy which was refused.

On June 3, 1925, the General Accident Assurance Corporation cancelled a health and accident policy which it had theretofore issued to him.

On October 23, 1916, the Penn Mutual Life Insurance Company issued to him a life policy. On June 4, 1926, he asked that a provision be attached providing for the payment of certain disability benefits in the event of accident or illness. There was a written application and a medical examination. The examiner reported that the applicant was suffering from heart trouble and his application was refused.

In 1923 the Massachusetts Mutual Protective Association issued to him a policy against accident and illness. In October, 1923, he was paid for twelve days total and ten days partial disability for injury to his finger. In May, 1924, he was paid for disability covering a period of 165 days on account of neuritis. In March, 1925, he was paid for disabilities for broken ribs. He was paid in March, 1926, for disabilities due to erysipelas, and in June, 1927, for injuries suffered in an automobile accident.

On July 17, 1928, he applied to the Massachusetts Protective Association for a health and accident policy. His application was refused. He had theretofore forfeited a policy in that company for non-payment of premiums.

On May 28, 1928, he applied to the Iowa State Traveling Men's Association for a health and accident policy. His application was refused.

He tells us that in the past ten years he has applied for twelve or fifteen policies and that four or five applications have been refused.

Plaintiff's defense to this is that with the exception of the cancellation of a policy by the National Casualty Company

which he, in some way overlooked, the facts in each case were detailed to Mr. Maddox, the agent who secured the policy, and that since they were made known to him that knowledge was imputed to his company which is now estopped to rely upon them. Maddox says he wrote down the answers as they were given to him with one exception, namely, the answer which dealt with heart disease. This is his statement as to it:

"In asking that question he said he had some five or ten years ago. I have forgotten just whether it was five or ten years, to which I said if it had been more than five years I didn't think there would be any question about that, and the question was answered no."

The insured said that he had had no trouble at any time within the past five years. It will be noted that the application purports to cover only "local or constitutional diseases within the past five years," and it was upon this basis doubtless that the agent was of opinion that attacks like this which happened more than five years ago need not be considered.

Mr. Ratcliffe introduced in evidence the following statement signed by him and verified by Mr. Maddox:

"When I took your policy I told your agent, Mr. O. L. Maddox that I had had heart trouble, and he said how long has it been. I told him that it was in May, 1920. He said well it had been more than five years and that it did not come within the time limit. He also asked me if I had had it since that time. I told him that I had worked every day since. After that he said that he would not report it as it had been so long and you have worked every day since that time, the five years period was specified on application as dating back for any disease or illness.
"OK
"O. L. MADDOX A. V. RATCLIFFE."

This was written after a controversy had arisen and in it plaintiff does not charge Maddox with failure to write into the application any other information which dealt with his health or dealings with other companies.

Maddox was an ordinary soliciting agent whose duty it was to secure such applications as he could and to send them on to his company for approval. The Ratcliffe application was his first successful venture.

Ratcliffe himself had been an insurance agent and was a man of experience in that work. He had represented at least three companies and felt himself so well qualified that he at one time contemplated delivering a radio address on insurance. We are not dealing with an ignorant applicant and an experienced agent who sought by devious ways to increase his commission.

The applicant knew the necessity for full disclosure of material matters and he knew that policies are usually issued or refused on the basis of statements made in the application. He said that in the instant case he did not read it over and for this reason: "It wasn't necessary. I knew what was in it. * * * I took it for granted that he (Maddox) had authority to act as he did and I signed it." Whatever his knowledge may then have been it was complete upon his receipt of the policy for to it was attached an exact copy. Misrepresentations material to the risk are fatal. Code, section 4220.

We do not mean to say that his failure to recall some minor payment made upon an accident policy in another company would be material to the risk assumed, but if an applicant in the preceding nine years had made on other accident and health policies eleven claims certainly such information would be important. It would tend to show either that the making of claims was a habit or that misfortune had dogged his footsteps. Information as to policies cancelled and applications rejected is always important.

Questions should be answered with frankness for a statement literally true may be highly misleading. This is his testimony as to heart trouble:

"Q. Did you mean to leave the impression you had not had it since 1920?

"A. I told him I had been able to work every day since.

"Q. Did you tell him you were well?

"A. I didn't tell him, I told him I had been able to work.

"Q. You meant by that answer to give Mr. Maddox the impression that you had not had heart trouble since 1920?

"A. No, sir, I did not, I told him I had been able to work every day since.

"Q. Why didn't you answer Mr. Maddox's question directly and tell him you were either well or not well?

"A. So far as I knew from the way I felt about it, I was well.

"Q. That was what you intended Mr. Maddox to believe, was it?

"A. So far as I knew I was well.

"Q. And you wanted him to believe that?

"A. When he asked me was I well, I said, 'I have been able to work every day.' I felt well and was able to work at home and do my work at the office and walk home and work ten hours a day. I slept good and could eat everything I wanted to.

"Q. My question was, did you intend by that answer to lead Mr. Maddox to believe that you were well at that time?

"A. I wanted him to form his own conclusion."

Ratcliffe rightly contends that good faith is a matter of first importance and of course he contends that such was his conduct here. He tells us that the reinstatement was not at his instance but upon the earnest solicitation of the defendant company. He also tells us that he was in 1929 reluctant to insure with the defendant at all because of the fact that he already had a policy in the Benefit Association of Railway Employees; that he could not carry them both, and that a new policy would force him to drop the old, but the old policy paid him $100 a month and under the new he might be paid $150 a month.

██ ██ A soliciting agent with power to take applications is the agent of his company. Where an applicant has no knowledge of limitations upon his power he may assume that they are co-extensive with the business entrusted to his care. He has all ostensible power. *Royal Ins. Co.* v. *Poole*, 148 Va. 363, 138 S. E. 487; *Royal Indemnity Co.* v.

*Hook,* 155 Va. 956, 157 S. E. 414; 2 Joyce on Insurance, section 472. But the insured must not have been responsible for any mistakes or omissions. *Harrison* v. *Provident Relief Ass'n,* 141 Va. 659, 126 S. E. 696, 40 A. L. R. 616. The applicant did not disclose all that he knew about his heart condition. The answer as written was manifestly as he wished it to be written.

We come now to other material misrepresentations.

In *Provident Relief Ass'n* v. *Butts,* 158 Va. 259, 163 S. E. 66, 67, Chief Justice Campbell said:

"But let us assume that plaintiff revealed the true situation to the agent, and that the agent, in his zeal to obtain business perpetrated a fraud upon his principal. Is the principal bound by the fraudulent act of the agent? We think not."

No agent has power to perpetrate a fraud upon his principal. If the applicant knows that there are misrepresentations in the answer as written and that they are material, there is fraud in the inducement when a policy is issued upon their faith. He cannot depend upon the power of the agent, in the language of the street, to put it over.

"Where the insured at the time of making the application, gives full, true and correct answers, relying upon the skill, honesty, and good faith of the company's agent to fill out the application correctly, and such agent makes out the application incorrectly or inserts answers different from those given or false answers, the company cannot take advantage thereof, and where the applicant is ignorant of the discrepancy or wrongful act of the agent he is entitled to recover on the policy, and this rule applies even though the agent in such case has transcended his actual authority." 2 Joyce on Insurance, section 475.

We are not dealing with a case in which full disclosures were made and in which the agent left out what he thought were non-essential details. Here the agent was new to the business and the applicant was an expert of extended experience.

In *Mutual Life Ins. Co.* v. *Hilton-Green,* 241 U. S. 613, 36 S. Ct. 676, 680, 60 L. Ed. 1202, are these statements:

"The general rule which imputes an agent's knowledge to the principal is well established. The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest. But this general rule does not apply when the third party knows there is no foundation for the ordinary presumption—when he is acquainted with circumstances plainly indicating that the agent will not advise his principal. The rule is intended to protect those who exercise good faith and not as a shield for unfair dealing. * * *

"The assured at the least consciously permitted an application containing material misrepresentations to be presented by subordinate agents to officers of the insurance company under circumstances which he knew negatived any probability that the actual facts would be revealed; and later he accepted policies which he must have understood were issued in reliance upon statements both false and material. He could claim nothing because of such information in the keeping of unfaithful subordinates. Moreover, the false representations accompanied and were essential parts of the policies finally accepted. He did not repudiate, and therefore adopted and approved the representations upon which they were based. Beyond doubt an applicant for insurance should exercise toward the company the same good faith which may be rightly demanded of it. The relationship demands fair dealing by both parties." See, also, *New York Life Ins. Co.* v. *Fletcher,* 117 U. S. 519, 6 S. Ct. 837, 29 L. Ed. 934.

We do not mean to say that this agent was in fact unfaithful. He tells us that the application as written fairly represents the statements made. But if we assume that he was, the omissions were material; Ratcliffe knew that they were material and he accepted a policy to which they were attached.

Plaintiff's policy covered "disabilities resulting from

disease, the cause of which originated more than thirty days after the date of this policy." Of course, no company is liable unless the claim asserted is covered by its contract. *United Security Life Ins. & Trust Co.* v. *Massey,* 159 Va. 832, 164 S. E. 529, 167 S. E. 248, 85 A. L. R. 306.

Ratcliffe, in his formal claim, said that symptoms of his disease first appeared on November 7, 1931. It was on that date that he stopped work. He tells us that his heart first gave him trouble in 1920 and that his physicians, in December of that year, told him that he was able to go to work and he had worked continuously from then until the 7th of November, 1931, subject to certain interruptions in no wise attributable to his heart. He said that in 1920 he took digitalis, a heart stimulant, but discontinued its use in a short time and did not resume its use until just before he quit work in 1931. He appears to have stated in an examination made by Dr. Smith in that year that he had suffered with shortness of breath for ten years. This, he says, is a mistake; it should have been ten days. In 1921 he consulted Dr. Rothschild of New York who prescribed quinidine, a heart stimulant, which however, he did not take, and that this doctor told him at that time he could find nothing the matter with his heart. In 1922 he consulted Dr. Willius, a member of the staff of the Mayo Hospital, who advised him to take digitalis, cut down his activities and live as an old man should. He did not follow this advice. In 1927 he again went to the Mayo Hospital. This, he tells us, he did not do on his own account, but went as companion to a sick friend. Dr. Willius was not there but he was examined by two of his assistants who gave him no advice. In 1926 Dr. Baker examined him. As we have seen, he held a life policy in the Penn Mutual Life Insurance Company and made application for health benefits under it. Dr. Baker recommended that he be accepted though he reported that his heart was not normal.

This is the final statement of the applicant made upon re-cross-examination:

"Q. Did you state to Dr. Smith in November, 1931, when

he examined you, that your heart had been irregular since 1920, and that you had never known it to be regular since 1920?

"A. If it is down there I did.

"Q. I am asking you if you made that statement to Dr. Smith?

"A. I could not tell you if I did or did not. If it is down there I did, but the irregular didn't keep me from working and feeling good and well."

The substance of his claim is that he had been told that he had recovered, that he believed that he had recovered and that he had worked steadily since 1921.

Dr. C. A. Hutchinson was called in 1920. He took the patient to Atlanta to consult a specialist. The diagnosis was "auricular fibrillation." This he defines: "The auricles of the heart, the valves, don't act properly, and the auricle fills up with blood and the heart quivers instead of contracting and causes the action of the heart to be irregular or fibrillate." Under his care the patient "seemed to be cured within six months and returned to work." He was not consulted again professionally until 1931, but Ratcliffe's brother-in-law, saw him frequently, kept him under observation and saw nothing which indicated any recrudescence of the old trouble. In October, 1931, he was again called into conference and found that the patient's heart "was going to the bad." Elsewhere he tells us that conditions were about as they were in 1920. In December, 1931, he reported to an accident company that conditions were chronic but in his examination was unwilling to commit himself on that point.

Dr. R. W. Holly was the next witness. He was called into conference in 1931 and found that the heart was enlarged and conditions bad, but could form no ideas as to how long that situation had been in being.

Dr. C. B. Bowyer was called for the defendant. He is chief surgeon of the Interstate Railroad Company for which Ratcliffe worked, and examined him as a part of the day's work. He advised him "that he would have to be careful

of his exercise and living conditions or something serious might develop from this condition he had with his heart." It was on his advice that Ratcliffe went to the Mayo Clinic in 1922. That clinic sent back a report, the substance of which he communicated to Ratcliffe and told him that "he would have to be careful and that the work we would line up with the Interstate railroad was such as we felt he could carry on with the condition his heart was in, and he continued that work and those duties as I recall until 1927."

He tells us what the conditions then were: "The muscles of the heart showed the heart was giving away, and that the heart was not standing up, performing its normal function." In 1927 he again referred him to the Mayo Clinic and from it received a report. Thereupon, "I told him he would have to take more rest and lessen his activities; that his work would have to be lessened and he would have to be more careful with his general activities." Conditions were then worse than they were in 1920. "He was given digitalis and instructed to increase the dosage until he got certain effects, and when I decided that his heart was digitalized or under the influence of the drug, we cut the dose down, and I would recommend he stop digitalis and leave it off for a certain period of time, but how many months he left it off or how often he took it during those years I am not in a position to say.

"After 1927 with the instructions he was given, he was also instructed to report to me when he noticed any physical condition or abnormal condition with reference to his heart, or his breathing, sometimes he would come to me once a month, sometimes oftener, and sometimes it might be three months, and during 1928, 1929 and 1930, he continued with his work and I cannot say there was much change in his condition during those three years. In 1931 he did develop some symptoms, as I recall it was in the latter part of 1931, and in November, about sixty days prior to November, he developed symptoms, in 1931, and during that sixty days he gradually grew worse and I became alarmed at his condition, and I referred him to the George Ben Johnston Hos-

pital for certain tests and advice and recommendations as to his condition."

During all of this time he saw nothing the matter with the patient's mind. In 1921, Dr. Rothschild wrote to the witness that he could find nothing very definite the matter, that he advised the continued use of digitalis and that the patient remain in New York to be treated with quinidine and said that the prognosis there was excellent.

As we have seen, this advice of Dr. Rothschild's was not followed. Ratcliffe came back and went to work and notwithstanding the advice of Dr. Bowyer, continued to work until his final breakdown. His duties increased rather than lessened.

Dr. W. A. Baker testified on behalf of the defendant. He was the physician who made the examination for the Penn Mutual in 1926. He reported that heart action was not normal. "Mitral regurgitation, and irregularity of heart action." He recommended that the applicant's petition be favorably acted upon by the company but it was not.

Plaintiff went to the Johnston Hospital at Abingdon and was there examined by a Dr. F. H. Smith. Dr. Smith tells us of the patient's history of his case:

"He stated that that trouble had started suddenly in 1920, when he had run some twenty feet to catch a train; after he had spent some three months in bed he had consulted Dr. Strickler of Atlanta, where a diagnosis of auricular fibrillation was made; and he had been sent back to bed, and been put on digitalis; that he was able to go back to work on December 18, 1920; and he had been able to work ever since until about two months previous to my examination. On August 1, 1921, he had consulted Dr. Rothschild of New York, and Dr. Rothschild had advised him to use quinidine, but that he had declined to use it. In September he had consulted Dr. Willius of the Mayo Clinic, where his tonsils were removed and Dr. Willius had advised against the use of quinidine. In 1923 he had consulted Dr. Hatcher of Chattanooga, who had operated upon his nose and sinus. In 1927 he had returned to the Mayo Clinic to see Dr. Willius.

and the doctor advised him he had done very well in the five year interval and advised him to continue the same treatment of digitalis since 1920; skipping at intervals when his heart was better and resuming it when his heart got worse; that at no time since 1920 had his pulse been regular, but that he had been able to walk as far as he wanted to on a level or up-hill road if he took his time, until two months before I examined him; that in that last two months he had found it more and more difficult to do his work, felt heavy on his feet, had to rest more, and had to whip himself to go. I think that about summarizes fully his history of his illness."

Ratcliffe further told him that "his heart condition had been better at times and again worse, until the two months immediately preceding my examination, and since then it had been worse."

His mental condition during the examination appeared to be perfectly normal. Dr. Smith thought "the heart has probably been fibrillating for eleven years. Now it seems probable he is beginning to get some myocardial decompensation."

 We reach without difficulty the conclusion that the plaintiff's present trouble originated before his policy was taken out and of course before it was reinstated. It did not originate more than thirty days after either of their dates.

For this reason and because of material misstatements in the application there can be no recovery, and this notwithstanding the verdict and judgment. An examination of the instructions charged to be erroneous is unnecessary.

*Reversed.*