## Richmond

EDNA GILLEY v. THE UNION LIFE INSURANCE COMPANY, INCORPORATED.

June 8, 1953.

Record No. 4080.

Present, Eggleston, Spratley, Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*Robert H. May,* for plaintiff in error.

*Broaddus, Epperly & Broaddus,* for defendant in error.

MILLER, J., delivered the opinion of the court.

On June 28, 1950, at the instance of an agent of The Union Life Insurance Company, Inc., plaintiff, Edna Gilley, signed a written application for insurance upon the life of her mother, Mary Vena Altizer. A policy of $500.00 was issued on July 1, 1950, in which plaintiff was named beneficiary. The insured, Mary Vena Altizer, who was 53 years old when the policy was issued and delivered, died on June 23, 1951, of cancer.

The beneficiary, Edna Gilley, instituted this action against defendant to recover on the policy. The company defended on the ground that false representations and answers material to the risk had been made by plaintiff in the application, and it insisted that the contract was thereby voided.

At conclusion of the testimony, the court struck all of plaintiff's evidence, and upon return of verdict for the company, judgment was accordingly entered. We granted Edna Gilley a writ of error.

During 1950 and for several years prior thereto, Mary Vena Altizer lived in a small house in plaintiff's yard at Preston, Virginia. Until the summer of 1948 she had enjoyed sound health, but on July 2 of that year, she went to a hospital in Martinsville, Virginia. At that time she was suffering from abdominal pains and on July 13, 1948, underwent an operation. Her surgeon, Dr. Francis B. Teague, removed a mass growth from her intestines, and plaintiff was so informed. Though the patient's trouble was actually cancer, that fact was not told to plaintiff or to the patient. Dr. Teague fully realized the seriousness of his patient's illness, but hoped to cure her so that she might resume a normal life. After the operation the patient improved, and on July 31, 1948, she was able to leave the hospital. On that date she went to plaintiff's home where she was confined to her bed for two weeks longer. About a week or two later, she went to her own home and resumed a normal life, which was reasonably active for one of her years. She performed all of her usual household work, such as washing and cooking, and attending to her flowers, and she also did some additional housework in her daughter's home.

Following the operation, Dr. Teague saw his patient several times at his office, and on September 23, 1950, he examined her and found no evidence of a recurrence of her trouble. Throughout the two years following her stay in the hospital, Mrs. Altizer seemed to be in good health and appeared to have fully recovered.

In June of 1950, S. R. Kanode, an agent who solicited insurance contracts for defendant, called upon plaintiff at her home. He first talked with her about insurance on the life or lives of her immediate household, but it does not appear that any applications were taken at that time. On June 28, 1950, he called by plaintiff's home again. On that occasion Mrs. Altizer

was in the yard, and he discussed with plaintiff the matter of taking out a policy on her mother's life. Plaintiff testified that she informed him about the operation upon her mother for removal of a growth from her intestines. She thought this would probably prevent the acceptance of her mother as a risk, but after the agent was informed of these facts, he inquired as to her mother's then health. Plaintiff told him that it appeared to be good, and said, "As far as I know, Mother feels a lot better than I do." The agent then took out an application for insurance and asked her numerous questions which she said she answered truthfully. The application was filled out by the agent and he then asked her to sign it. She signed her mother's name thereto without reading any of the answers that had been written in by the agent. The agent made no attempt to interview the insured, and she was never informed that the application had been made or the policy issued.

It later turned out that as to three material questions answers had been written in that plaintiff says she did not give. To question number 6, "When last sick?", the answer recorded by the agent was "never." To question number 16, "Has the said life been under treatment in any dispensary, Hospital, or asylum or been an inmate of almshouse or any other like institution?", the answer was "No." Obviously these two answers as recorded were untrue, as the agent well knew, if plaintiff's testimony is correct.

Question number 17 asked if insured had ever suffered from any one of some eighteen to twenty stated diseases, among which was "cancer." The answer "No" was written in. Plaintiff said question number 17 was never asked her.

To question number 7, which was: "Present state of health?" the recorded answer, which plaintiff does not deny giving, was "Good." Plaintiff said that this was a truthful statement of what she knew or had been told about insured's health.

A part of the certificate which appears on the application just above the signature reads as follows:

"* * * I declare that the answers to the questions above and on the reverse side hereof * * * are strictly correct and true; that the several questions were duly asked and that the answers given by me are truly recorded hereon; that I made no other or different answers or representations; * * * "

In the policy is found this paragraph:

"This Policy, and the application for same, contain the entire contract between the Company and the Insured. All statements made by the Insured shall, in the absence of fraud, be deemed representations and not warranties, but no such statement shall avoid this Policy unless it is contained in the application for this Policy."

When the agent was called as a witness on behalf of the company, he stated that he had written in the answers as given, but he could not recollect any particulars of the occasion or any specific question that he had asked or any answer that plaintiff had given. In this respect he testified as follows:

"Q. Did you ask the applicant the questions here listed on this card? All the questions on this application?

"A. That's right.

"Q. Will you state whether or not they were answered as indicated by your handwritten answers?

"A. I always put down whatever they tell me. I always put it down just like they tell me.

"Q. Do you recall any particular conversation concerning this application between you and Mrs. Gilley who is the Plaintiff? This lady over here.

"A. No, sir, I don't."

He did not, however, claim that plaintiff ever saw what answers he actually wrote on the application or that she read any questions or answers when he had her sign her mother's name.

When the policy was issued on July 1, 1950, and delivered to plaintiff, neither the original application nor any copy was attached. Thus plaintiff never saw the application after she signed it.

In March, 1951, insured became ill again and Dr. Samuel Adams was called to attend her on the fourth of that month. In his testimony he said that on the day he first saw the patient, plaintiff informed him about the operation in July, 1948, and told him that her mother's trouble had been cancer. However, on cross-examination he said she may not have used the word "cancer" but did use the word "malignancy.' Insured's condition became increasingly worse, and she re-entered the hospital and died on June 23, 1951, from cancer of the colon.

When plaintiff was recalled to the witness stand in rebuttal, she denied that she told Dr. Adams that her mother was operated

on for cancer or "malignancy." She insisted that she merely told him that a growth had been removed from her intestines, "for that was what was told to me."

Our statutory law pertinent to the questions involved is embodied in section 38-7, Code of 1950[1], which follows:

"All statements, declarations and descriptions in any application for a policy of insurance shall be deemed representations and not warranties, and no statement in such application or in any affidavit made before or after loss under the policy shall bar a recovery upon a policy of insurance, or be construed as a warranty, anything in the policy to the contrary notwithstanding, unless it be clearly proved that such answer or statement was material to the risk when assumed and was untrue."

When the evidence is appraised in the light most favorable to plaintiff, as it must be, it appears that answers different from those given by her to questions numbered 6 and 16, which were material to the risk, were written into the application by the agent, and one material question, number 17, was falsely answered that was never asked her. To question number 7, having to do with the state of insured's health, the agent inserted the answer, "Good," though plaintiff said he had been told of her mother's operation.

Is plaintiff precluded from recovery because, without reading or ascertaining its contents, she signed the application when it falsely recorded material answers not given by her? Or is she precluded because her answer as to her mother's health, though honest, was untrue?

■ There is conflict of opinion as to the meaning of the phrase "good health" or the like phrase "sound health." Much authority is to the effect that the terms must be strictly construed and mean actual good health. Under that construction the insured must be in fact in sound or good health as distinguished from health apparently good and honestly thought to be sound. *Vance* on Insurance, 3rd ed., sec. 102, pp. 640-643.

In the absence of a clear showing of a stricter meaning, we have construed the term "good health" to import apparent and reasonably sound health without any knowledge on the part of the applicant to the contrary. *Greenwood* v. *Royal Neighbors of America,* 118 Va. 329, 87 S. E. 581.

"Good health means apparent good health, without any

[1] Now section 38.1-336, 1952 Cum. Supp., Code of 1950.

ostensible, or known, or felt symptom of disorder, and does not exclude the existence of latent unknown defects." *May* on Insurance, sec. 295, p. 625.

This quotation is cited and adopted in *Greenwood* v. *Royal Neighbors of America, supra,* at p. 334; *Schwarzbach, et al.* v. *Ohio Valley Protective Union,* 25 W. Va. 622, 657, 52 Am. Rep. 227.

Thus, if plaintiff honestly thought that her mother was in sound health and in good faith gave correct and truthful answers to the agent, she is not precluded from recovery solely because the insured then suffered from a latent illness of which plaintiff was unaware. Her statement that her mother's health was "good" as recorded does not vitiate the policy if plaintiff had not been told and did not know about the disease from which her mother suffered, and honestly believed her to be in sound health.

There is likewise much conflict of authority upon the question of whether or not an applicant who has signed a written application for insurance shall be permitted to say thereafter that material representations, warranties or answers appearing therein are other and different from those made and given by him to the agent. 17 *Appleman,* Insurance Law and Practice, sec. 9401, *et seq.; Vance* on Insurance, 3rd ed., sec. 44, *et seq.;* 4 *Couch,* Insurance Law, sec. 842f and 842g; 81 A.L.R. 833; 117 A.L.R. 790; 148 A.L.R. 507.

Authorities that decline to allow the applicant to prove that the agent, unknown to him, wrote in false answers base that conclusion primarily upon the ground that to do so would be allowing a written instrument to be contradicted and varied by parol evidence. The other view allows the applicant to invoke the doctrine of equitable estoppel against the insurer. The company is denied the right to avoid the policy on the ground that false and material representations or warranties were made in the application when it can be shown that its agent, without the knowledge or participation of the applicant, wrongfully wrote into the application false answers. *Vance* on Insurance, 3rd ed., sec. 44. p. 262, and sec. 87, *et seq.;* 17 *Appleman,* Insurance Law and Practice, *supra.* Virginia decisions that have invoked the doctrine of equitable estoppel against the insurer under somewhat similar circumstances are: *Franklin Fire Insurance Co.* v. *Bolling.* 173 Va. 228, 233, 3 S. E. (2d)

182; *Massachusetts Bonding & Ins. Co.* v. *Piedmont Service Station, Inc.,* 165 Va. 167, 175, 181 S. E. 397; *Sands Adm'r., etc.* v. *Bankers' Fire Insurance Co.,* 168 Va. 645, 192 S. E. 617.

Defendant insists that as plaintiff signed the application, she should be denied the right to say that answers not given by her were inserted by the agent. It says that under authority of Virginia decisions, it was incumbent upon plaintiff to read or apprise herself of the contents of the application before she signed it, and if she failed in that respect, she may not now be heard to say that answers contained therein were false. *Royal Insurance Co.* v. *Poole,* 148 Va. 363, 138 S. E. 487; *Flannagan* v. *Northwestern Mutual Life Insurance Co.,* 152 Va. 38, 146 S. E. 353, and *Provident Relief Association* v. *Butts,* 158 Va. 259, 163 S. E. 66, are cited to sustain that claim.

The *Poole* case, *supra,* had to do with a fire insurance policy; Judge Chichester, there speaking for the court, quoted with approval from *New York Life Insurance Co.* v. *Fletcher,* 117 U.S. 519, 6 S. Ct. 837, 29 L. ed. 934, (a life insurance policy case) as follows:

"* * * It was his duty to read the application he signed: He knew that upon it the policy would be issued, if issued at all. It would introduce great uncertainty in all business transactions, if a party making written proposals for a contract, with representations to induce its execution, should be allowed to show, after it had been obtained, that he did not know the contents of his proposals, and to enforce it, notwithstanding their falsity as to matters essential to its obligation and validity. Contracts could not be made, or business fairly conducted, if such a rule should prevail, and there is no reason why it should be applied merely to contracts of insurance. There is nothing in their nature which distinguishes them in this particular from others. But here the right is asserted to prove not only that the assured did not make the statements contained in his answers, but that he never read the application, and to recover upon a contract obtained by representations admitted to be false, just as though they were true. If he had read even the printed lines of his application he should have seen that it stipulated that the rights of the company could in no respect be affected by his verbal statements, or by those of its agents, unless the same were reduced to writing and forwarded with his application to the home office. The company, like any other principal, could limit the

authority of its agents, and thus bind all parties dealing with them with knowledge of the limitation. It must be presumed that he read the application and was cognizant of the limitations therein expressed.'' *Royal Insurance Co.* v. *Poole, supra,* at 371.

The *Flannagan* case, *supra,* and *Provident Relief Association* v. *Butts, supra,* approve and adhere to the *Poole* case. In the *Flannagan* case at page 62, we find the following quoted from the *Poole* decision:

''It was his duty to read the application which he signed, and he was charged with notice of what it contained.''

Without expressly removing the strict obligation imposed upon the applicant by the *Poole, Flannagan* and *Butts* cases, *supra,* to ascertain what answers to questions material to the risk had been written into the application, the more recent decisions of *Mutual Benefit, etc., Association* v. *Ratcliffe,* 163 Va. 325, 175 S. E. 870; *Mutual Benefit, etc., Association* v. *Alley,* 167 Va. 144, 187 S. E. 456; *Green* v. *Southwestern Voluntary Association,* 179 Va. 779, 20 S. E. (2d) 694, have modified the rule adopted in those earlier cases.

In *Mutual Benefit Association* v. *Ratcliffe, supra,* the following statement from 2 *Joyce* on Insurance, sec. 475, is approved:

''Where the insured at the time of making the application, gives full, true and correct answers, relying upon the skill, honesty, and good faith of the company's agent to fill out the application correctly, and such agent makes out the application incorrectly or inserts answers different from those given or false answers, the company cannot take advantage thereof, and where the applicant is ignorant of the discrepancy or wrongful act of the agent he is entitled to recover on the policy, and this rule applies even though the agent in such case has transcended his actual authority.''

In *Mutual Benefit, etc., Association* v. *Alley, supra,* at page 151, Justice Hudgins, now Chief Justice, cited the *Ratcliffe* case, and then quoted with approval from Cooley's Briefs on Insurance (2d ed.), p. 4111, as follows:

'' 'So, too, when the application is filled out by the agent from his own knowledge, no information being sought from the insured, who signs the application in blank or without reading it, relying on the agent's good faith and assumption of knowledge, the false statements are the fault of the company through its

agent and the insured cannot be called on to bear the consequences.' ''

Our most recent consideration of this specific question was had in *Green* v. *Southwestern Voluntary Association, supra.* There the purpose to liberalize the rigid rule of the early decisions which forbade the applicant the right to prove that the agent had inserted false answers into the application unknown to the applicant is made evident.

It thus appears that several decisions rendered subsequent to the *Flannagan, Poole* and *Butts* cases, *supra,* have departed from the strict holding of those cases which precluded an applicant, who had signed the application, from showing that false answers unknown to him had been recorded by the company's agent.

These later decisions are in accord with the weight of authority and with what we consider the better view. We adopt the principle as set out in 29 Am. Jur., Insurance, sec. 846, p. 643, and 148 A. L. R. 508.

"Apart from any question of the effect of an attempt by the insurer to limit the authority of its agent by stipulations inserted in the application or policy, or provisions in its by-laws, or by statute, the rule supported by the great weight of authority is that if an application for insurance is drawn by an agent of the insurer, who fills in false answers to the interrogations contained therein which are truthfully answered by the insured, without fraud, collusion, or actual knowledge of the insured, or the existence of circumstances from which constructive knowledge of such falsity might be imputed to him, the insurer cannot rely upon the falsity of such answers in seeking to avoid liability under the policy issued upon the application. The view generally taken is that the agent in making out the application acts for the insurer, and that the insurer is therefore estopped to assert the mistake or, as has been said in some cases, the mistake is deemed to be waived by the insurer." 29 Am. Jur., Insurance, sec. 846, p. 643.

Insofar as the *Poole, Flannagan* and *Butts* decisions are in conflict with that statement, they are overruled.

For the reasons assigned, the judgment is reversed and the case remanded for a new trial not in conflict with this opinion.

*Reversed and remanded.*