## Richmond

NEW YORK LIFE INSURANCE COMPANY, A CORPORATION v. JESSIE
RYAN EICHER.

June 18, 1956.

Record No. 4532.

Present, All the Justices.

The opinion states the case.

*Charles G. Stone*, for the plaintiff in error.

*Thomas G. Martin*, for the defendant in error.

SMITH, J., delivered the opinion of the court.

This action was instituted by Jessie Ryan Eicher against the New York Life Insurance Company, to recover on a life insurance policy issued by that Company insuring the life of her deceased husband, Welty A. Eicher, in her favor in the sum of $2,000. In its Answer and Grounds of Defense the Company denied liability on the ground that "the policy of insurance in question never became legally binding

because of material misrepresentations and concealment on the part of Welty A. Eicher in his written application for insurance regarding his physical condition and medical history for the preceding five years."

. The trial resulted in a verdict and judgment in favor of the plaintiff beneficiary for the face amount of the policy. To review that judgment a writ of error was awarded the Insurance Company, which contends in this court that the trial court erred: (1) in overruling the Company's motion to set aside the verdict and enter final judgment in its favor, or in the alternative, to grant a new trial on the ground that the verdict was contrary to the law and the evidence, and (2) in admitting in evidence, over the Company's objection and exception, the testimony of five witnesses as to the good reputation for truth and veracity of the deceased insured.

Since our view of the Company's first contention is determinative of its liability, it will not be necessary for us to decide the second.

No medical examination was required as a condition to the issuance of the policy, but it was based on the answers of insured to certain questions in a written application, signed by him in two places and dated April 23, 1953. The application shows that in reply to certain questions the insured stated, among other things, that: to the best of his knowledge and belief he had been continuously in good health for the past five years; he did not have, had never had and had never been told that he had "high blood pressure" or "heart trouble"; he had never undergone any surgical operation or been under observation or treatment in any hospital, except for a "tonsilectomy—about 1930"; the only physicians he had consulted or been examined or treated by within the past five years were Dr. Paul K. Candler of Warrenton, Virginia, in connection with an attack of "flue" in February 1953, and Dr. James L. Dellinger of Warrenton, on March 25, 1953, in a routine examination for his employer and "found O. K."; within the previous five years he had not had any electrocardiograms or other laboratory test, except a chest X-ray at the time of the routine examination for his employer.

Immediately following this information and just above the insured's signature, we find this statement in his application: "On behalf of myself and of every person who shall have or claim any interest in any insurance made hereunder, I declare that I have carefully read each and all of the statements, representations and answers made and recorded above, that each of them is full, complete and true, and

agree that the Company believing them to be true shall rely and act upon them accordingly."

A photostatic copy of the application was attached to and made a part of the policy, which was executed by the Company on May 5, 1953, and delivered in person to the insured by the Company's agent, W. C. Pangle, on May 8, 1953. The policy contains this "NOTE" attached to the photostatic copy of the application: "This copy should be carefully examined and if any error or omission is found, full particulars, with the number of the policy, should be sent immediately to the Home Office at: 51 Madison Avenue, New York 10, N.Y." [1]

On December 15, 1953, about seven months after the policy was delivered, the insured, who was then 36 years of age, died suddenly of "acute heart failure and hypertension." Shortly thereafter, upon receipt of plaintiff's claim, the Company denied liability on the policy beyond the sum of $88.27, the amount of the premiums paid thereon with interest, and tendered that amount to the plaintiff. She retained the Company's check for the amount tendered, but refused to cash it and subsequently instituted this action.

Several physicians were called as witnesses to prove the insured's medical history. Dr. Paul K. Candler of Warrenton testified that he examined the insured on June 30, 1950, and found that "the main trouble he had was with his blood pressure, which progressively got worse under normal medical treatment that we had been giving from the time we first saw him on up until the latter part of 1950, at which time we felt that he ought to have some further consultation in regard to the pressure, and he was then referred to Dr. Winkenwerder in Baltimore for consultation in regard to his blood pressure, which was the early part of 1951."

---

[1] The following provisions appear in the policy:

"7. *The Contract.* This Policy and the application therefor, copy of which is attached hereto and made a part hereof, constitute the entire contract. All statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and no statement shall avoid this Policy or be used in defense to a claim hereunder unless contained in the written application and a copy of the application is indorsed upon or attached to this Policy when issued. No agent is authorized to make or modify this contract, or to extend the time for the payments of premium, or to waive any lapse or forfeiture or any of the Company's rights or requirements. * * *

"8. *Incontestability.* This Policy shall be incontestable after it has been in force during the lifetime of the Insured for one year from its date of issue * * *" except for reasons not relevant here.

A provision similar to the last sentence of provision number 7 of the policy is also contained in the insured's application.

Thereafter, on January 9, 1951, the insured entered Johns Hopkins Hospital in Baltimore where he remained until January 13, 1951. His physician, there, Dr. Walter L. Winkenwerder, testified that the insured's "records show, according to Mr. Eicher's statements, that he had high blood pressure, originally noticed in 1941, when he was examined for selective service, and five years later his local doctor found his blood pressure still to be elevated, and for the five months prior to his admission to the hospital his blood pressure had apparently increased, and he was having definite headaches, which were considered to be related to his high blood pressure." He further testified that his examination of the insured "revealed high blood pressure in both arms, 180 over 120, and this was sustained during the period of hospitalization. * * * And you might add that the examination showed that the heart was moderately enlarged, due to his high blood pressure." Doctor Winkenwerder also testified that when the insured came to the hospital he "was fully aware of his hypertension condition, and he desired the various tests that were made while he was in the hospital, and he was fully advised of the results of all the examinations, and the nature of the high blood pressure, and the prognosis of the high blood pressure, and he was further advised concerning the sympathectomy operation and the reasons for which it was advised."

As a result of his examination, Dr. Winkenwerder recommended a sympathectomy operation, and upon receipt of this recommendation the insured entered the Medical College of Virginia Hospital at Richmond, where he was under the care of Dr. John M. Meredith, who testified as follows:

"I operated on Mr. Welty Eicher in a two-stage operation for relief of high blood pressure. The first operation was * * * February 22, 1951, and the second procedure was the following month, March the 5th, 1951. He had a history of high blood pressure for several years, and his blood pressure was 190 over 130 when he came in our hospital in Richmond on February 21, 1951.

"The operation that was done was what is known as a sympathectomy, which consists in removing a long chain of nerves along the side of the spinal column, those nerves having to do with the control of the size of the blood vessels, and following their removal the blood pressure drops, because the diameter, the size of the blood vessels is increased, is the principle of the operation. It's done in a two-stage procedure always, and in this patient about a week, ten days apart, along in there."

A medical director of the Company testified that if the insured's true medical history, which is established by the foregoing uncontradicted evidence, had been revealed on his application for insurance the policy would not have been issued.

Hence, it is "clearly proved" as required by Code, § 38.1-336,[2] that insured's application for insurance contained answers and statements which were untrue and material to the risk when assumed. While these conclusions are not questioned by the plaintiff, she contends in her brief that: "The instructions offered by the plaintiff, which were received by the trial court without objection or exception by the defendant, presented rules of law spelled out in *Gilley* v. *Union Life Insurance Co.*, 194 Va. 966, 76 S. E. 2d 165, upon which the jury correctly based its verdict."

In the *Gilley* case we held that a plaintiff beneficiary, who had signed her mother's name to an application for insurance on the life of her mother, was not precluded from proving that false answers contained in the application were not given by her but were inserted by the insurance company's agent, she having given true answers and being unaware of their falsification. In the course of that opinion, we reviewed several of our own decisions and other authorities on the question of whether an applicant who has signed a written application for insurance may be permitted to say thereafter that material representations, warranties or answers appearing therein are other and different from those made and given by him to the agent, and adopted the following rule:

" 'Apart from any question of the effect of an attempt by the insurer to limit the authority of its agent by stipulations inserted in the application or policy, or provisions in its by-laws, or bv statute, the rule supported by the great weight of authority is that if an application for insurance is drawn by an agent of the insurer, who fills in false answers to the interrogations contained therein which are truthfully answered by the insured, without fraud, collusion, or actual knowledge of the insured, or the existence of circumstances from

---

[2] Code, § 38.1-336 provides:

"*When answers or statements of applicant not to bar recovery on policy.*—All statements, declarations and descriptions in any application for a policy of insurance or for the reinstatement thereof shall be deemed representations and not warranties, and no statement in such application or in any affidavit made before or after loss under the policy shall bar a recovery upon a policy of insurance, or be construed as a warranty, anything in the policy to the contrary notwithstanding, unless it be clearly proved that such answer or statement was material to the risk when assumed and was untrue."

which constructive knowledge of such falsity might be imputed to him, the insurer cannot rely upon the falsity of such answers in seeking to avoid liability under the policy issued upon the application. The view generally taken is that the agent in making out the application acts for the insurer, and that the insurer is therefore estopped to assert the mistake or, as has been said in some cases, the mistake is deemed to be waived by the insurer.' 29 Am. Jur., Insurance, sec. 846, p. 643." 194 Va., at page 974.

In adopting this rule we expressly overruled, insofar as they were in conflict therewith, the cases of *Royal Insurance Co.* v. *Poole*, 148 Va. 363, 138 S. E. 487; *Flannagan* v. *Northwestern Mutual Life Insurance Co.*, 152 Va. 38, 146 S. E. 353, and *Provident Relief Association* v. *Butts*, 158 Va. 259, 163 S. E. 66, in which cases it was held that where the applicant for insurance signed an application containing false answers, he was precluded from showing that the false answers had been inserted by the insurer's agent unknown to the applicant. Hence, under the rule of the *Gilley* case, the insurer in an action on an insurance policy can not avoid liability on the ground that false answers appear in the application, if it is shown that: (1) the false answers contained in the application were inserted by an agent of the insurer, and (2) the answers to the interrogations contained in the application were truthfully given without fraud or collusion, and (3) the applicant had no knowledge, actual or constructive, that his application contained false answers.

It is clear therefore that if the applicant is a party to the fraud of or in collusion with the insurer's agent or has actual or constructive knowledge that his application contains false answers material to the risk, neither he nor the beneficiary under the policy will be allowed to profit thereby and the insurer will not be estopped by the knowledge or conduct of its agent from asserting the falsity of such answers as a bar to its liability on the policy. Furthermore, in the absence of peculiar circumstances, there is a presumption that the applicant has read the application which he signed and he is *prima facie* charged with knowledge of its contents, but this presumption may be rebutted. However, the rule of the *Gilley* case applies even though, as here, the insurer attempts to limit the authority of its agent by stipulations inserted in the application and policy, and even though a copy of the application is attached to and made a part of the policy. But the existence of these facts should be taken into consideration with all the other facts and circumstances of the particular case in determining

whether the applicant had any knowledge that the answers contained in the application were false.

In the instant case it is uncontradicted that insured's signed application contained answers that were false and material to the risk when assumed, and that at the time of signing his application the insured was aware of his physical condition, previous medical examinations and operation for high blood pressure. Therefore, in the light of the rule of the *Gilley* case and instructions[3] granted without objection, it was incumbent upon the plaintiff to rebut the presumption that the insured knew his application contained false answers. And in rebutting this presumption it was essential that plaintiff prove that the answers to the interrogations contained in the application were truthfully given by the insured.

The application was filled out in the insured's office and the only persons present at that time, other than the insured, were the Company's agent and Gentry Wayne Forrester, who was, like the insured, an assistant engineer for a telephone company. Forrester testified that while the agent was in the office, which he shared with the insured, talking to the insured and "writing on a form that looked like an application," he was about eight feet from them "working on a print," but he did not know whether the agent and the insured were sitting or standing. And although this witness testified that he did not leave the office while the application was being filled out, he did not remember any questions asked by the agent or any answers given by the insured. He was questioned on this point as follows:

"Q. You don't then, remember the questions that Mr. Pangle asked Mr. Eicher from the form, and you don't remember the answers that Mr. Eicher gave Mr. Pangle in regard to the application, do you?

---

[3] Plaintiff's instructions read as follows:

"1. The Court instructs the jury that if you believe from the evidence that the application for insurance here involved was filled in by W. C. Pangle, agent for the Defendant, New York Life Insurance Company, then the fact that the insured, Welty A. Eicher, signed said application is not conclusive evidence that he had read or had knowledge of the answers contained therein, and that whether or not Welty A. Eicher did have actual or constructive knowledge of the contents of said application is a question of fact to be determined by the jury; but there is a prima facie presumption that a person has read and understands a writing to which he affixes his signature.

"2. The court instructs the jury that if you believe from the evidence W. C. Pangle, agent of the defendant, New York Life Insurance Company, filled in the answers to the questions on the applications, knowing that said answers or any of them were false, then the defendant is estopped to deny liability under the terms of the policy, unless you further believe Welty A. Eicher, the insured, was aware of the falsity of the answers, in which event the plaintiff cannot recover."

"A. No, sir, I wasn't paying attention to what they were talking about."

Forrester further testified that he was "quite sure" that he discussed in a "general conversation" with the Company's agent, prior to the date on which the insured's application was filled out, the insured's sympathectomy operation and general health. This testimony was denied by the agent who testified that he first learned of insured's high blood pressure and operation when he was getting proofs of insured's death. The agent further testified that he filled out the application while sitting beside the insured at the insured's desk, and that he read each question in the application and wrote down each answer exactly as given to him by the insured.

Even if it be assumed that at the time the application was filled out the Company's agent was aware of the insured's true medical history, the most this fact tends to prove is that the agent knew the answers were false and does not establish that the insured gave truthful answers to the questions asked in the application or that he did not know that the application contained false answers. The insurer is not estopped to avoid the policy where both the applicant and the insurer's agent know that material answers contained in the application are false. *Gilley* v. *Union Life Insurance Co., supra*; *Sands* v. *Bankers' Fire Ins. Co.*, 168 Va. 645, 657, 192 S. E. 617; *Mutual Benefit, etc., Ass'n* v. *Ratcliffe*, 163 Va. 325, 335, 175 S. E. 870. Hence, the plaintiff can not recover in the instant case because there is no evidence in the record to rebut the presumption that the answers recorded in the application were those given by the insured and that he knew the application contained false answers.

For the reasons stated, the verdict must be set aside, the judgment reversed and a final judgment entered for the Insurance Company. Plaintiff will recover the premiums paid on the policy and the Insurance Company will recover its costs both in the trial court and in this court.

*Reversed and final judgment.*