Mrs. Seena H. QUILLIN, Appellant,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellee.

No. 8045.

United States Court of Appeals Fourth Circuit.

Argued April 20, 1960.

Decided June 30, 1960.

Samuel Intrater, Washington, D. C. (Albert Brick, Washington, D. C., and Adelard L. Brault, Fairfax, Va., on brief), for appellant.

Henry H. Paige, Washington, D. C. (John M. Lynham, Drury, Lynham & Powell, and John W. Jackson, Washington, D. C., on brief), for appellee.

Before SOBELOFF, Chief Judge, and HAMLEY[*] and BOREMAN, Circuit Judges.

HAMLEY, Circuit Judge.

Seena Quillin, beneficiary under a $10,000 policy of insurance on the life of her husband, brought this action to recover the proceeds of the policy. Jurisdiction in the district court rests on diversity of citizenship. Defendant, The Prudential Insurance Company of America, denied liability on the ground that the application contained untrue statements material to the risk.[1]

Judgment was entered for defendant, save for the return of $43.60 in premiums, on a directed verdict entered at the close of the evidence. Plaintiff appeals. She argues here that there was substantial evidence tending to counter the company's defense and that the case therefore should not have been taken from the jury.

On November 27, 1957, Jack Quillin, the insured, consulted Dr. Joseph Beinstein. This doctor testified that the patient complained primarily of bleeding and loss of weight. Dr. Beinstein further testified that upon his initial examination he found that the insured was anemic and had an enlarged spleen. It was also his testimony that the results of a complete blood count disclosed that the "blood picture was very abnormal at this time." In his notes made at that time Dr. Beinstein named lymphoblastoma as a diagnostic possibility. This is a tumor-related condition arising from the blood-forming organs and in-

---

[*] Sitting by designation of the Chief Justice.

1. Under Code of Virginia, § 38.1–336, the answer or statement of an applicant for such a policy does not bar a recovery on the policy "unless it be clearly proved that such answer or statement was material to the risk when assumed and was untrue."

cludes many diseases, of which leukemia is one.

Dr. Beinstein testified that, "not wanting to alarm the patient at this time to any extent, I asked Jack to come back for a, [sic] one or two additional studies. We wanted to check the prostate and the rectal canal to make sure that these were normal." Quillin next saw Dr. Beinstein on December 2, 1957. Examination of the prostate and rectal canal revealed no serious condition. Dr. Beinstein testified that he then recommended hospitalization for further study by hematologists. Quillin went to George Washington University Hospital on December 5, 1957.

Dr. Pearl Holly, a hematologist, examined Quillin at the hospital on December 6, at which time she performed peripheral blood tests and a bone marrow study. Dr. Holly testified that it was then medically apparent that Quillin had a malignant blood disease, the indication being that it was leukemia or myeloid metaplasia. The insured left the hospital on December 8.

Dr. Beinstein was called to Quillin's home on the evening of December 16, 1957. The doctor found that Quillin had come down with a fever, was suffering from chest pains, and had begun to cough up rusty sputum. Returning to Quillin's home the following morning. Dr. Beinstein found no improvement and symptoms highly suggestive of acute pneumonia. The doctor recommended immediate hospitalization.

The insured was admitted to George Washington University Hospital on December 19, 1957, and remained there until December 28, 1957. On March 8, 1958, he entered Mount Alto Veterans Hospital. He died there on April 23, 1958, from subacute monocytic leukemia.

The application for the policy in question is dated December 17, 1957. Appellant testified, however, that it was actually filled out on December 14 or 15, 1957. The application was filled out by Mrs. Hilma I. Joerg, an agent of the company, while the applicant, Jack Quillin,

and appellant were seated on either side of her. The agent read each question aloud and upon the applicant making oral answer thereto made a notation at the appropriate place in the application. After the application had been completely filled out it was signed by Quillin.

Appellant does not deny that the statements in the application on which appellee relies are material to the risk. She argues, however, that as to some there was evidence which presented a jury question as to whether the statements were untrue. Concerning the remaining statements, falsity is conceded. Appellant contends, however, that there was evidence which presented a jury question as to whether the company was entitled to rely on such falsity in denying liability.

■ We will first consider the contention that a jury question was presented as to the truth or falsity of some of the statements contained in the application.

In question 5a of part 2 of the application the insured was asked to indicate how much his weight had changed in the last year. The answer indicated in the completed application is "none."

Appellant concedes that this is a correct recording of the oral answer which the applicant had given to the insurance agent. It is her contention, however, that under the evidence the jury should have been permitted to find whether the answer is true or false.

There unquestionably is substantial evidence tending to show that the answer is untrue. Dr. Beinstein testified that when the insured consulted him on November 27, 1957, he complained of a very marked loss of weight "over the preceding two and a half to three years." The complained-of drop in weight, according to Dr. Beinstein, was from around 200 pounds down to about 145 pounds. Dr. Donald R. Belky testified that on December 5, 1957, he was told by Quillin that the latter had experienced an "increasing weight loss of fifty pounds in the last two years."

The testimony given by appellant, however, constitutes substantial evidence to the contrary. She testified that her husband had not lost weight within the year preceding December 14 or 15, 1957. It was her testimony that his loss of weight had been about twenty pounds and had occurred prior to May 1956, when her husband had a tonsillectomy. After that operation, she testified, his weight remained steady. Further disputing Dr. Beinstein, appellant testified that her husband had never weighed over 170 pounds.

In view of this direct conflict in the evidence, the question as to the truth or falsity of the statement in the application concerning Quillin's weight was for the jury.

Question 13 of part 2 of the application inquired of the applicant whether he had ever (1) "been treated for," or (2) "had any known indication of" any disease or disorder of any parts of the body thereafter enumerated. Among the parts of the body which were enumerated were "blood, or blood vessels." The answer indicated in the completed application is "no."

Appellant does not deny that this is a correct recording of the oral answer which her husband had given to the insurance agent. But, as in the case of the answer to question 5, she argues that under the evidence the jury should have been permitted to find whether the answer is true or false.

It will be noted that question 13 consists of two parts. The first, in so far as here pertinent, inquires as to whether the applicant had ever been "treated for" any disease or disorder of the blood or blood vessels. There was considerable medical testimony to the effect that within the weeks and even days immediately prior to applying for the insurance policy Quillin was subjected to extensive diagnostic procedures relative to a serious abnormality in his blood. There seems to be no specific testimony, however, to the effect that he was actually "treated" for any such blood condition prior to the time Quillin applied for life insurance.

Dr. Beinstein testified, in fact, that when Quillin was in the hospital from December 5 to 8, 1957, no treatment was prescribed, stating: "We were just in for diagnosis at that time."

Assuming, however, that it could be found that Quillin had received some treatment for a disease or disorder of the blood or blood vessels, we do not believe that such a finding was required under the evidence. It follows that the question as to the truth or falsity of the answer to the first part of question 13 was for the jury.

The second part of question 13, in so far as here relevant, inquires as to whether the applicant had ever had "any known indication" of any disease or disorder of the blood or blood vessels. The parties have, and we believe correctly, construed the word "known" used in this context as referring to any indication known to the applicant. Hence, an indication of a disease or disorder known to others but not communicated to the applicant would not impeach the negative answer to this question.

There is evidence to the effect that at the time he applied for the policy Quillin knew that there was an indication of a disease or disorder of his blood or blood vessels. Dr. Beinstein testified that on November 27, 1957, Quillin consulted him complaining primarily of bleeding and a marked loss of weight. He further testified that on December 2, 1957, he informed Quillin that there was a serious abnormality in the latter's blood.

Dr. Beinstein further testified, however, that it is the usual practice of doctors to first inform the family of a fatal illness such as cancer or leukemia and observe the family's wishes with regard to notifying the patient. He also testified that he did not tell appellant that her husband was suffering from leukemia until Quillin was hospitalized for the second time on December 19, 1957. This was after Quillin had applied for life insurance.

Dr. Holly, the hematologist who had performed certain diagnostic tests at the

hospital, testified that she did not tell Quillin that he had a blood disease. Dr. Thomas N. Carter testified that a definite diagnosis of leukemia was not made until the latter part of March 1958. It was his testimony that he then imparted this information to Mrs. Quillin, but that Jack Quillin was not told until a week or a week and a half prior to his death on April 23, 1958. Mrs. Quillin testified that her husband had discussed with her all of his other illnesses, but had never told her that he had any suspicion of a blood disease. She also testified that "he didn't know he had any blood disease."

It thus appears that the only direct testimony to the effect that Quillin had been told of his blood condition prior to making application for insurance was that of Dr. Beinstein. He was testifying in September 1959 on the basis of his recollection of what occurred on December 2, 1957. He did not have the aid of notes taken at the time concerning the nature of his conversation with Quillin.

If appellant's testimony that Quillin had never weighed over 170 pounds is to be believed, Dr. Beinstein's ability to recollect prior conversations was already open to question. He had testified that on November 27, 1957, Quillin had complained of a weight loss from 200 to 145 pounds. The accuracy of Dr. Beinstein's recollection is also undermined by the fact that if he told Quillin on December 2, 1957, of his serious blood condition this was a departure from what he said was the custom of doctors to first notify the family.

In view of these considerations and the testimony of other witnesses to which reference has been made, it is our opinion that a jury question was presented as to whether at the time of applying for the insurance Quillin knew of any indicated disease or disorder of his blood.

We conclude that with regard to the answer to question 5a and that part of question 13 pertaining to diseases or disorders of the blood or blood vessels, the truth or falsity of the statements contained in the application presented a jury question. It would therefore have been error to direct a verdict for defendant in so far as these statements in the application are concerned.

■ In denying liability, however, appellee also relies on other statements material to the risk contained in the application concerning the applicant's physical condition and medical history. Appellant concedes the falsity of these other statements. But it is her contention that in view of the evidence bearing on the way in which the application was filled out and signed, the jury could have found that the company was not entitled to deny liability with regard to these untrue statements.

The rule which appellant thus invokes was first announced in Gilley v. Union Life Ins. Co., 194 Va. 966, 76 S.E.2d 165, at page 170, and is restated as follows in New York Life Ins. Co. v. Eicher, 198 Va. 255, 93 S.E.2d 269, 273:

> " * * * the insurer in an action on an insurance policy can not avoid liability on the ground that false answers appear in the application, if it is shown that: (1) the false answers contained in the application were inserted by an agent of the insurer, and (2) the answers to the interrogations contained in the application were truthfully given without fraud or collusion, and (3) the applicant had no knowledge, actual or constructive, that his application contained false answers."

Concerning the first of the three elements of this rule, it is here established beyond dispute that the false answers contained in the application were inserted by an agent of the insurer. Relative to the second such element, the substantial evidence is in dispute as to whether the applicant gave truthful oral answers to the questions propounded in the application. The jury was accordingly entitled to find that he did. There is no evidence of any collusion between the applicant and the agent. Nor is there, apart from the question of knowledge, any evidence tending to show fraud.

It follows that if it is to be held as a matter of law that the Gilley rule is inapplicable here it must be on the ground that the jury could not have found in favor of the appellant on the third element of that rule. As noted above, under the third element of the rule it is required that the applicant have no knowledge, actual or constructive, that his application contained false answers.

If Quillin read the application after it was filled out, he of course had actual knowledge that it contained false answers. It is unquestioned that he signed the application. In Eicher, supra, at 93 S.E.2d 273, it was held that "there is a presumption that the applicant has read the application which he signed and he is prima facie charged with knowledge of its contents, but this presumption may be rebutted."

It follows that if no evidence had been introduced to the effect that Quillin had failed to read the application the presumption that he had done so would have stood unchallenged, and a prima facie case of knowledge of the falsity of the answers would have been established. But evidence was produced to the effect that Quillin had not read the application. His wife, appellant herein, so testified. While the insurance agent testified to the contrary, the jury was entitled to believe appellant. The presumption having been rebutted, no prima facie charge of knowledge could arise from the fact that the application was signed.

Appellee does not appear to challenge this view. The company argues, however, that the evidence offered by appellant to the effect that Quillin did not read the application is insufficient to establish that he had neither actual nor constructive knowledge of what it contained. On the contrary, it is asserted, there are items of evidence which conclusively establish knowledge by Quillin of the falsity of the answers. Appellee also reminds us that the appellant was called upon not only to negate actual knowledge of the falsity of the answers, but

also "the existence of circumstances from which constructive knowledge of such falsity might be imputed to him." See Gilley v. Union Life Ins. Co., supra, 76 S.E.2d at page 170.

The items of evidence independent of the signing of the application to which appellee calls attention pertain mainly to the circumstances under which the application was filled out. These circumstances, as summarized in appellee's brief, are as follows:

"  *   *   *   insured was seated immediately adjacent to the agent on a small sofa when the questions on the application were asked and recorded; the agent had the application form in front of her and the insured was attentive to each question; the original application form, which appears in the record as defendant's exhibits numbers 5 and 6, is a large document that can easily be read; a substantial amount of medical information including the names of several doctors and two hospitals, which appellant claims was given to the agent by her husband and was not included in the application, would have required considerable time and space to record.   *   *   * "

All of this evidence was undisputed. Its only relevancy, however, is to establish circumstantially that Quillin had actual or constructive knowledge that false answers were being recorded on the application.

The evidence undoubtedly has probative value in this direction. But to say that such established facts would warrant a finding of factual or constructive knowledge is not to say that such a finding must be made. This was for the jury to decide.

What has just been said would be true had no counter evidence been submitted. But there was counter evidence in this case consisting of the following testimony by appellant:

"Q.  I say did Mrs. Joerg have the questions in front of her on the printed sheet as she was asking Mr.

Quillin about them? A. Yes, she had the application form there.

"Q. He was sitting next to her, and did he follow the questions that she was asking as she would ask, did he look and see for himself what they were? A. No, I don't believe he looked at the form. He just sat there and asked the questions, answered the questions.

"Q. Do you know whether or not he watched her as she put down the answers? A. No, I wouldn't say that he did."

The quoted testimony tends to rebut the inference of actual or constructive knowledge which may be drawn from the items of evidence upon which appellee relies. It also tends to establish affirmatively that Quillin did not know that false answers had been recorded on the application. Whether it was successful in either respect depends upon the weight to be accorded all of the evidence on the point. It was the function of the jury and not the court to make this determination.

Appellee also calls attention to the fact that the policy itself, which was delivered to the home of the applicant long prior to his death, contains a complete copy of the application. But Mrs. Quillin testified that the policy was delivered to her at a time when her husband was ill in bed and that she placed it in a drawer. She further testified that her husband never saw the policy and she did not examine it until after his death. In Eicher, supra, at 93 S.E.2d 273, it was stated that the Gilley rule applies "even though a copy of the application is attached to and made a part of the policy."

In view of what is said above we conclude that it was error to take this case from the jury on the ground that appellant had failed to produce evidence warranting a jury finding that Quillin was without actual or constructive knowledge that false answers had been recorded on the insurance application.

Reversed and remanded for a new trial.

Reversed and remanded.